### EDISON ELECTRIC LIGHT CO. v. WESTINGHOUSE et al.

(Circuit Court, D. New Jersey. April 10, 1893.)

**1. PATENTS—ELECTRIC LIGHT—EDISON FEEDER PATENT.**

Letters patent No. 264,642, issued to Thomas A. Edison, September 19, 1882, for an "electric distribution and translation system," consist of a combination of two circuits,—the one, a consumption circuit, in the main conductors of which the "drop in tension" is not sufficient to vary, practically, the candle power of the lamps connected therewith; and the other, a feeder circuit, having upon it no translating devices, so that all the harmful "drop in tension" due to distance may be located upon it without affecting the relative candle power of the lamps in the consumption circuit. *Held* that, in view of the prior state of the art, the patent involves a union of distinctive elements, forming a patentable combination, and not merely a collocation or aggregation of elements, which is not patentable.

**2. SAME—ANTICIPATION—WERDERMANN BRITISH PATENT.**

The invention described in the Edison patent was not anticipated by the invention described in the British letters patent granted June 21, 1878, to Richard Werdermann, for an improvement in apparatus for electric lighting, in which the patentee endeavored to overcome the "drop in tension" by compelling the electrical current to pass over or through an equal length and sectional area of a conductor in going to and returning from each lamp, by so arranging the parallel circuits in which the lights are included that the light which is the first one or the nearest to the source of electricity on a positive conductor is also the first or nearest to the source of electricity on the negative conductor, or by so arranging them that the lamp or light which is first with regard to its position on the positive conductor is last with regard to its connection with the negative conductor.

**3. SAME—ANTICIPATION—KHOTINSKY FRENCH PATENT.**

The Edison invention was not anticipated by the invention described in the French letters patent issued March 19, 1875, to M. D. Khotinsky, for improvements in electric lighting, consisting—First, of a peculiar arrangement of the conductors of the electrical current, which permits the current to pass into each lamp or light independent of the others, so that the

variation or failure of light in one lamp has no effect upon the others; and, second, the arrangement of the burners of the lamps in such a manner that after the consumption in service of one carbon, or other luminous conductor, the current passes automatically into another luminous conductor, and from that into a third, and, after the consumption of all the luminous conductors provided, the current travels automatically to a spiral or conductor of any form, whose resistance is equal to that of the lamp in connection as described; such letters patent containing an indication that the inventor intended to obviate the "drop in tension" incidental to an extended system of lighting, and not disclosing the law for the proportions of the circuit in regard to the number of lamps connected therewith, nor giving any data by which it might be concluded that the lamps would vary from each other in candle power, which variance would be cured by the invention.

4. SAME—ANTICIPATION—LANE-FOX LETTERS PATENT.

The invention described in the Edison letters patent was not anticipated by the inventions for which two British letters patent were granted to Lane-Fox in 1878, although these inventions were intended to obviate the difficulties due to "drop in tension;" the form adopted being to enlarge the system of conductors as they approach nearer to the central station, forming what is generally known as the "Tree System,"—a system of distribution in which the electrical energy starts from the central station on the largest of the conductors in the system, and divides itself into so many branches as are required to operate the lamps; the branches diminishing in sectional area as the distance from the central station increases; the system being aided by attaching Plante batteries for storing up electricity, and distributing it.

5. SAME — ANTICIPATION — METHODS IN USE FOR DISTRIBUTION OF GAS AND WATER.

The invention described in the Edison letters patent was not anticipated by the prior methods and systems of gas and water distribution for public use; these methods and systems not being such as to form a basis upon which the Edison electric system could have been constructed.

6. SAME — ANTICIPATION — METHODS EMPLOYED IN ELECTROTYPING AND ELECTROPLATING.

The Edison invention was not anticipated by the methods in which electricity had previously been utilized in electrotyping and electroplating.

In Equity. Bill by the Edison Electric Light Company against Westinghouse, Church, Kerr & Co., to restrain an alleged infringement of letters patent. Decree for complainant.

Betts, Atterbury, Hyde & Betts, Frederic H. Betts, Eaton & Lewis, and S. B. Eaton, for complainant.

Kerr & Curtis and Leonard E. Curtis, for defendants.

GREEN, District Judge. The bill of complaint in this cause charges the infringement by the defendants of letters patent No. 264,642, granted Thomas A. Edison, September 19, 1882, for an "electric distribution and translation system." The alleged infringement is charged to be the construction and operation of an "electric light plant" in the city of Trenton, in this state.

Previously to the issuing of the letters patent, and on or about the 21st day of June, 1881, Mr. Edison duly assigned to the complainant all his right, title, and interest in and to the said invention, and any letters patent of the United States which might thereafter be granted to him therefor. The invention which was intended to be secured by the letters patent is declared by Mr. Edison, in the specification, to relate to a method of equalizing the tension

or "pressure" of the current through an entire system of electric lighting, or other translation of electric force, preventing what is ordinarily known as a "drop" in those portions of the system the more remote from the central station.

Six claims were made in the letters patent, but, of these, only the 1st, 2d, and 3d are relied upon by the complainant in this action. They are as follows:

(1) A consumption circuit, in the main conductors of which the drop in tension is not sufficient to vary, practically, the candle power of the lamps connected therewith, in combination with feeding conductors connecting the consumption circuit with the source of electrical energy, and having no translating devices connected therewith,—the drop in tension upon such feeding conductors not affecting the relative candle power of the lamps of the consumption circuit,—substantially as set forth.

(2) A consumption circuit, in the main conductors of which there is a definite, small drop in tension, not sufficient to vary, practically, the candle power of the lamps connected therewith, in combination with feeding conductors connecting the consumption circuit with the source of electrical energy, and having no translating devices connected therewith; the loss upon such feeding conductors being greater than upon the main conductors of the consumption circuit,—substantially as set forth.

(3) The combination of a consumption circuit, in the main conductors of which the drop in tension is not sufficient to vary, practically, the candle power of the lamps connected therewith, with a feeding circuit having no translating devices, and extending from the source of electrical energy to the center of the consumption circuit, substantially as set forth.

The defendants, by their answer filed in this suit, deny infringement, and insist that there is no patentable novelty in the alleged invention; contending that the invention claimed by Mr. Edison had been anticipated by various preceding patents, and had been described in numerous scientific and technical publications, and that the method and system of gas and water supply now customarily in use in large cities were entirely analogous and similar to the scheme devised by Mr. Edison for electrical distribution.

It goes without saying that no problem ever so severely vexed the marvelous ingenuity of invention as that which concerned itself with the safe, economical, and successful distribution of electric light over a large area of territory by subdivision of the current. The problem involved, as apparently unresolvable factors, not only the bringing to perfectibility the devices by which the translating of electrical vibrating force, electrical current, or electrical energy into the illuminating light could be readily and surely accomplished, but, as well, the successful evolution of a method or a process whereby the same current could be thoroughly divided in supply to numerous translating devices, and be rendered so subject to regulation that its operation under all imaginable circumstances should be uniform. In other words, the problem was to devise a system of distribution by which the current of electricity necessary to operate

the lamps in a district or territory of large area could be propelled to all parts of the district, at all times, in such volume, and under such pressure, as to cause all the lamps operated to develop a practically uniform and useful amount of illuminating power. Not more than 10 years have gone by since the most learned and astute scientists on both sides of the Atlantic unitedly declared the utter impossibility of its solution. After the most careful consideration, the most incessant experimentation, the intensest study, electricians and physicists acknowledged their inability to conquer success. At this time, indeed, the obtaining of light from a single lamp, or from a small group of lamps, by transmission of electric current, had been successfully accomplished. Edward Austin King, as far back as 1846, had been granted by the English government letters patent for an invention which consisted in "the application of continuous metallic and carbon conductors, intensely heated by the passage of a current of electricity, to the purposes of illuminating." And ever since, down to the very present, the records of the various departments for the granting of letters patent in almost every nation teem with descriptions of the inventions of those who have devoted their time and exercised their skill in the investigation of the subject of electrical illumination, and who have published in this manner their conclusions to the world.

But the successful production of "light" as the result of the intense heating of a carbon or metallic conductor by a current of electricity accomplished little or nothing towards overcoming those difficulties which were considered insurmountable by learned men, and were regarded as standing directly in the way of successful lighting of large districts by the illuminating power of the electric current. Those difficulties were the economic distribution and the proper division of the electrical current on a scale, and under conditions of convenience, adequate to a system of illumination for domestic purposes, in villages and cities, analogous to that of gas. The chief difficulty arose out of the admitted fact that no method was known at that time by which the electric current necessary to operate the lamps of such low candle power as to be comparable in illuminating power with the light from ordinary gas burners, could be sent to all parts of the territory to be supplied, at all times, in such volume, and under such pressure or tension as to cause all the lamps to develop a useful amount of light, at the same time having the current so regulated and controlled that it would never rise in degree at any lamp so as to injure the lamp itself by excess of power; that the system, practically, should be so arranged that the consumer would be enabled to illuminate or extinguish all the lamps on his premises without sensibly affecting the current of electricity passing by him to other lamps. In other words, the question was, how could there be delivered to all lamps in use, whether few or many, at all times a uniform current of electricity, of intensity severely adequate for the work required to be done?

In the attempt to solve the problem of electric lighting, two systems of arranging the translating devices with reference to the source of the electrical current or energy, and to each other, have

been suggested and tested by practical use. The one is known as the "Series" system; the other, as the "Multiple Arc" system.

In the series system the translating devices or lamps are arranged upon a single conductor wire, along and through or by means of which the electric current is impulsed through its entire length, and to each lamp, causing each lamp to be illuminated successively. As the current in such a system must, of necessity, pass through each intervening lamp between the generator and the end of the circuit to reach the one beyond, it is obvious that to overcome the joint resistance of the conducting wire, and of each lamp, it must be the subject of very great propulsive force. In the multiple arc system, lamps are arranged upon parallel bridges connecting the outgoing with the incoming conductor, and are supplied with electrical current simultaneously. In operating such a system the current sent from the generator, upon reaching the first bridge, itself divides; one part going over the bridge to the first lamp, and the balance surging forward to the second bridge and lamp, where the same action is repeated. In this system each lamp is practically independent of any other in the system, so far as the mere translation of the current into light is concerned. The electrical current which burns illumination into the first lamp has performed entirely its destined work, and in no wise concerns itself with any other lamp in the system. Each lamp is operated by its own proportion of the current. Hence, it follows that the distinctive characteristic of this system is found in the very great quantity of current which is required for successful operation in a large system; for at each lamp the primal electric current is necessarily diminished by that portion which devotes itself to the operation of that lamp.

That these two systems marked a great advance in electrical lighting is very apparent. Yet, when put to the test of use in the lighting of large areas, defects that seemed fatal speedily manifested themselves. Thus, in the series system, there was first the difficulty that—as all the lights were placed upon the one conductor wire, and the same current necessarily passed through each lamp in succession—the initial propulsive force exerted upon it must equal the sum of the resistance of all the lamps in the system. That the electric pressure might be kept within manageable bounds would, of necessity, greatly limit the number of lamps. Another and equally serious defect was caused by the fact that the extinguishment of one lamp by the breaking of the circuit necessarily extinguished all lamps; for the breaking of the circuit at any point severed its continuity, and caused an absolute stoppage of the progress of the current. The putting out of one lamp by destruction of the circuit extinguished all lamps upon the circuit.

The difficulty in the multiple arc system was equally disheartening, looked at from a financial standpoint. As was stated, in such system each lamp depends upon and receives a portion of the whole of the electrical current for its own wants and separate use. The "supply current," so called, must therefore, at the outset, be very large in quantity. Each lamp diminishes the whole by a certain

percentage. To operate, therefore, successfully, a system constructed on this theory, and covering an extensive area, and a very large number of lamps, the conductor wire must be quite equal in size to the sum of all the wires which would pass from the source of electrical energy separately to and from each lamp in the system. In other words, to carry the excessive volume of electrical current required for the supply of the lamps in the multiple arc system over a large area, would necessarily require conductors enormous in size,—in bulk equal to the combined bulk of all the small conductors that would be used in carrying the current to each separate lamp, if separate illumination was attempted. The cost of such enormous conductors, if the area of lighting was extensive, and the lamps very many in number, became simply prohibitory. Financially, the multiple arc system, as a means of extensive electrical lighting, was doomed to failure by this unfortunate necessity.

There remains yet another difficulty inherent in all systems of electric lighting,—in fact, in all systems or methods of transmission of electric energy or current,—which still further complicated the problem which we have been considering, and it arose from what is technically called "drop in tension." "Drop in tension" means "loss of the propulsive force which measures initially the forward movement of the electrical energy or so-called 'current' as it leaves the generator, and seizes upon and follows the conductor." This "drop in tension" is the necessary resultant of the obstructive operation of the molecules of the conductor to and upon the electrical energy or "potential," as it is called, as it forces its way through the conducting matter. Whatever the primary force may be that generates these phenomena to which is given the concrete name "electricity," it makes its presence known through a rapid vibration of the molecules of matter. What the exact character of those vibratory motions is can hardly be stated with scientific precision. It is quite enough to know that they differ in form, in direction of vibration, and in rapidity of movement.

Now, electrical energy can be utilized the more readily by being placed, to a certain extent, in confinement, and thus be compelled to exercise its power within certain defined limits; in other words, through the medium of a conductor, which simply means the substance or matter or thing which usually receives the electrical energy, and whose molecules readily respond to its resultant vibratory movements. Now, scientists declare that such electrical vibratory movements in a conductor depend, not only upon its specific character, but as well upon its size,—that is, its sectional area and length,—and that, the smaller the area in which these vibratory motions are propagated, the greater is the resistance offered. Accepting this as a law of electrical energy, it follows that, the larger the conductor in diameter, the less the resistance to the electrical energy as it passes through it; and, conversely, the smaller and more confined the space in which the vibrations are to be propagated, the greater the resistance to be encountered. In overcoming this resistance the current of electricity—or, more properly, the "electro-motive force or tension"—uses up a certain proportion of

itself, necessarily. This is true whether the resistance to be overcome is that obtruded in its path by the nature and character of the conductor, or arises from the work performed,—that is, the translation of the current into illumination, or other useful purpose. This inevitable loss or waste of tension caused by the self-expenditure of the force in subduing and overcoming the obstructions of the conductor is called "drop." The longer the wire, the smaller its sectional area; the greater the number of translating devices upon it, the larger the loss or waste. Hence, it would follow that the difficulty arising from these causes in the lighting by electricity of large areas, including a great number of lamps, would be almost prohibitory. The rule which governs the loss or "drop in tension" was given, on the argument, as this:

"With a given expense for conductors of a multiple arc system, the proportion or percentage of drop in tension increases, approximately, directly as the number of lamps and as the square of the distance."

Thus, twice as many lamps at twice the distance cause eight times the percentage of drop. It is quite apparent, then, that not a very great length of conductor, nor very many lamps, would be necessary speedily to cause a system to be wholly inoperative. The electro-motive force would be unequally used up in its effort to overcome the resistance, resulting in great inequality of action of lamps.

This statement, condensed from briefs of counsel in this case, discloses the problem which in 1880 electricians everywhere were trying to solve. How to light, not only economically, but how to light under any conditions, large areas, by the subdivision of electric force; how to overcome the resistance without the use of conductors so large as to be enormously expensive; how to prevent "drop in tension," so that its effect upon the lamps in the circuit should relatively be negligible. Only Mr. Edison seems to have found the solution, and by this alleged invention. In the specification forming part of the letters patent in this case, he thus states by what method and means he grappled with the difficulties, and overcame them:

"This invention," he says, "relates to a method of equalizing the tension or 'pressure' of the current through an entire system of electric lighting, or other translation of electric force, preventing what is ordinarily known as 'drop' in those portions of the system the more remote from the central station, and also to other features in systems for the utilization of electricity, as hereinafter explained.

"As is well known from patents already granted me, and prior applications pending, I use in my system an electric light formed of a continuing, incandescing conductor, large numbers of which are grouped into one system, supplied and regulated from a central station; main conductors leading from and to the central station; each lamp or translating device being in a derived circuit to the main conductors; the entire system being what is known as a 'Multiple Arc' system. From a central station the main conductors may proceed, and it is intended that they should, to a great distance, and supply a large number of translating devices. In such cases there is inevitably a difference in tension between various parts of the circuit, due to the resistance of the main conductors. This may be partially remedied by making the conductors very large near or at the station, gradually decreasing their size or conducting capacity; but such plan only lessens slightly the ratio of fall. To

obviate the difficulty I provide feeding conductors, which extend from the generator or generators to the main conductors of the lamp or consumption circuit or circuits; such feeding conductors not having any translating devices connected therewith, and being connected with the main conductors of the consumption circuit or circuits at the center, ends, or other points on such main conductors. From a central station several sets of such feeding conductors may run; each set feeding into its own lamp or consumption circuit or all the sets feeding into a connected system of lamp or consumption circuits. It will be seen that the drop upon the feeding conductors has no effect upon the relative candle power of the lamps of the system; the relative candle power of the lamps being affected only by the drop upon the main conductors of the consumption circuit or circuits between the end of a set of feeding conductors and points most distant from any feeding conductors. In order to maintain, practically, the same candle power throughout the system, the main conductors of the consumption circuit or circuits should be so proportioned that the drop in tension upon them shall not exceed a definite, small limit,—for example, five per cent. This drop will make a difference of less than a candle power in all the sixteen candle power lamps of the system, which difference is not perceptible to the eye. Upon the feeding conductors, however, any loss can be made. This loss will be varied according to localities, and the relative cost of copper for conducting purposes, and horse power for generation. This loss upon the feeding conductors in large and extended systems will generally be greater than upon the main conductors of the consumption circuit or circuits. It may be, for example, about fifteen per cent.; but circumstances might make it desirable to diminish the loss upon the feeding conductors down even as low as that upon the main conductors of the consumption circuit or circuits, or to increase the loss upon the feeders to more than fifteen per cent. * * *

"When it is desired to use a few lamps near the central station, they may be placed upon a direct circuit therefrom, with resistance at the commencement or home end of the circuit sufficient to then reduce the tension of the current in such circuit so that it shall only be equal to that in the more distant circuits, and one or more of such circuits may be combined with the circuits before described. When large buildings or blocks of buildings, using many lamps, are to be supplied, it may be desirable to lay therefor separate feeders, insulated from each other. Where several central stations are used in a city, each having feeding conductors leading to lamp-circuit conductors of the description before noted, it may be advisable to connect the feeding circuits of all the stations, equalizing the tension or pressure throughout the entire system of the place where the central stations are located."

In other words, Mr. Edison claims that the difficulties before alluded to, inherent in, and apparently prohibitory of, any system or method of lighting large areas of electricity, were surely obviated by his device of transmitting from the generator in a central station the energy or current along and through a conductor upon or in which the only "drop in tension" would be caused by the action of that energy or current in overcoming the resistance offered by the conductor itself, to another and independent conductor, upon which the translating devices should be congregated, and which would supply such a relatively small area, or parcel of a larger area, that the drop in tension suffered between the furthest translating device and the point of connection of the conductor would be negligible.

And this expresses, I think, what Mr. Edison intended should be comprehended in the three "claims" of his patent involved in this suit. To justify this statement it will be necessary to examine briefly the claims themselves. Regarding them in the most general way, they are simply claims for a combination. The combination

consists of two circuits,—the one, a consumption circuit; the other, a feeder circuit. But the consumption circuit is peculiar in its characteristics. It is a consumption circuit in the main conductors of which the drop in tension is not sufficient to vary, practically, the candle power of the lamps connected therewith. And the feeding circuit is equally peculiar, in that it has upon it no translating devices, and is of such nature and character, so far as its construction goes, that the drop in tension upon it shall not affect the relative candle power of the lamps in the consumption circuit. But this statement of the claims would be highly inaccurate, if permitted to stand alone. Other limitations must be regarded. Not only are the circuits, feeding and consumption, unique in their special characteristics, but, as well, are jointly applicable to the lighting by incandescent lamps, in multiple arc, of large areas, of which portions or parcels are very distant or remote from a central station, from which, however, emanates complete control. It is true that these latter limitations are not expressed in terms in the claims under consideration, or in either of them But, in drafting the claims, Mr. Edison, by the words used, clearly referred to the descriptive phraseology of the specifications of his invention preceding them. This is apparent from his adding to each claim the words, "substantially as set forth." That is, he reads into each claim, and as a material part of it, by the admitted effect of those words which he uses, "substantially as set forth," the distinctive characteristics of the system of lighting by electricity which he had previously described with great particularity in the specifications. Those characteristics are: (1) The use of incandescent lamps; (2) the lighting of a large territory; (3) the unique service of the system of conductors; (4) the proportioning of the conductors for that service; (5) the forcing of the drop in tension to materialize where it was negligible; (6) the absolute equality of pressure on the mains.

It is wholly unnecessary to argue that this must be the effect of the use of these words, "substantially as set forth." They are clearly words of limitation, and they refer back to the descriptive specifications as the source of a qualification of the general statements of the claims, and so relegate the invention, as claimed, to a field within the purview and operation there specifically named. These descriptive limitations are expressed in the specification as follows:

"I use in my system an electric light formed of a continuous, incandescing conductor, large numbers of which are grouped into one system, supplied and regulated from a central station; main conductors leading from and to the central station; each lamp or translating device being in a derived circuit to the main conductors; the entire system being what is known as a 'Multiple Arc' system."

### And again he says that his invention relates to—

"A method of equalizing the pressure or tension of the current through an entire system of electric lighting, or other translation of electric force, preventing what is ordinarily known as a 'drop' in those portions of the system the more remote from the central station."

These statements quoted from the specification show that the consumption circuit referred to as one of the elements of the combination stated in the claims is but a part of the whole system, of the specific character described in the specifications, and of which the characteristics are and were expressly intended to be such as stated.

And this construction, I think, is practically admitted to be the true construction of these claims by one of the principal expert witnesses produced by the defendants in support of their contention. I refer to the testimony of Mr. Pope in answer to ×-Q. 87, which is as follows:

"Is it not implied by the patent in suit that the systems of distribution to which the invention relates are only those in which some portions of the system are so remote from the central station that if all parts of the conductor and system of conductors from the central station to the extreme point or points of consumption were utilized for lighting purposes, by having lamps connected therewith, that such lamps would practically vary from each other in relative candle power by reason of excessive drop in tension?"

He says:

"I think it is implied by the patent, upon a fair construction, that the invention relates to a system of distribution in which many of the translating devices are quite remote from the central station, and that the patentee seeks to point out and describe such an arrangement of conductors as will avoid an unequal distribution of tension without incurring an inordinate expense for conductors. There can be no doubt, I think, that it was perfectly well known to electrical engineers long before August, 1880, that it was possible to avoid a variation in candle power in such a system, so far as candle power depended upon the quantity of current passing through a lamp, provided that the conductors might be made large enough to bring about such a result, and the question which presented itself at that time was how to secure these advantages without unnecessary waste of material."

"102 ×-Q. Are not the consumption circuits referred to in the patent circuits which, in extent, approximate the limit beyond which drop in tension is not negligible? A. It would be good engineering practice to make them so, and this is what I think the patent contemplates."

By the use of the words, therefore, referred to in the claims, this adaptability of the circuits—consumption and feeder—to these distinctive objects and purposes is thus indissolubly welded to, and made portion of, the elements of the combination called for and made requisite in the claims under consideration. If this construction of the scope and meaning of the claims be correct, it follows that Mr. Edison not only described, but properly claimed, a system, the general characteristics of which are that—

"It supplies electricity to 'consumers' using 'large numbers' of incandescent lamps in 'multiple arc,' requiring the maintenance of relatively equal difference of potential at their terminals, and so located with reference to each other, and to the station from which they are supplied, that, if supplied at one end of the circuit, the drop in tension between the nearest and most remote end could not be tolerated; that the supply is from a central station, separated from and uncontrolled by the consumers, or they by it; that these large numbers of lamps are connected with one or more 'consumption circuits,' the 'main conductors' of which consist of direct and return wires, so proportioned to the number and distance of such lamps that any fall in tension between the lamps nearest the feeder and those more remote is always negligible; that the lamps are of the kind described and referred to in previous patents and applications of Mr. Edison as giving light by means of a continu-

ous incandescent conductor; that the means of supply and regulation, so as to compensate for the uncontrollable actions of separated consumers, shall be from the central station, and through the feeding conductors, upon which all nonnegligible drop in tension is localized, and which, being free from connections with any lamps except upon the consumption circuit, are so situated with reference to the lamps that any desired drop in tension required by necessary economy in the size of conductors may be made upon them without harmfully affecting any lamps, or disturbing the equality of the candle power throughout the whole system; that the exclusive control over the feeding conductors is insured to the central station by the omission of all direct connections of the feeders with translating devices of any kind."

I quote the above summary from the brief of the complainant, and adopt it, as expressing fairly and justly what Mr. Edison accomplished.

It may be proper at this state of the discussion to consider whether this union of distinctive elements contemplated and described by the claims in suit forms a patentable combination, or amounts to a mere collocation or aggregation. The defendants strenuously insist that it is the latter, only; that the elements are all old, their action independent, their final effect not the result of coaction, and not in any sense novel. If this contention is well founded, these letters patent are worthless, for it is a well-settled principle that a mere aggregation of elements is not patentable.

What, then, is a patentable combination? Considered as a generic term, the combination may be defined to be a co-ordination of individual functions so as to constitute a common function. Co-ordination necessarily implies some modification of individual functions of each element as it existed prior to the combination. To be patentable, a combination must be in harmony with this definition, and as well, and as necessarily, must be possessed of novelty and utility. In the very able work of Prof. Robinson on the Law of Patents, he thus enlarges the definition just given of a patentable combination, and distinguishes between it and a mere aggregation:

"A combination is an instrument or operation formed by uniting two or more subordinate instruments or operations in a new idea or means. In one sense, every invention is a combination, since every art and article is composed of elements which, by inventive genius, have been brought together to serve a common use; but the distinction between a combination in this general sense, and that in which the term is technically employed in patent law, seems to be this: That in a patentable combination every subordinate element must, in its separate state, have been an operative means, capable of discharging its own peculiar functions, and producing its own physical effects, and also must, while in the combination, still perform its individual functions, and retain its individual identity. Where operations or instruments are thus united, one of two results must follow: Either each element remains unchanged in function and effect, or by the action of the elements upon each other, or their joint action on their common object, they perform additional functions, and accomplish additional effects. The former union is a mere collocation or aggregation of the elements. Although they have been brought together in an apparent organism, and rendered more available for use, they still remain the same distinctive and independent means, still acting as so many separate units, and not co-operating with each other to perform additional functions, and accomplish additional results. Such unions, therefore, are not a creation of new means. They do not involve the exercise of the inventive faculties, nor can they be protected by a patent. But when those elements are so united that by their reciprocal influence upon each other, or

their joint action on their common object, they perform additional functions, and accomplish additional results, the union is a true combination." **1 Rob. Pat. 216 et seq.**

This gives a safe criterion. If the new combination accomplishes results that could not have been achieved either by the individual or collective elements separately, then union must inevitably have brought into action some new, or as yet some unawakened, energy, which constitutes a new and independent means.

Now, the patent in this case successfully stands the application of this critical test. The result obtained by this device of Mr. Edison is the transmission from a distant generator of electrical current to a remote independent conductor, along or through which it is sent for service to numerous lamps, with equality of pressure, with no perceptible loss of tension, and is restrained by regulative means, operative only at the central station. It may be admitted that the action of the current as it traverses the consumption conductor is exactly similar to that which would follow if the generator had been placed at, and connected directly with, the end of that conductor; but the crucial fact is that there neither is nor is to be any generator so placed at the end of the conductor. The result which Mr. Edison sought to achieve, and which he has achieved, is that the electrical current shall act exactly as if there was indeed a generator there, where there is none. His object is to compel precisely the same action which would result in the consumption conductors if the generator had been directly in contact with the ends of those conductors; and that, too, when the generator was not only not in close or immediate connection, but was placed a long distance away. And he so combined and used his elements that he accomplished what he sought with so great an economy in the use of copper that for the first time he made electrical lighting feasible. Such achievement is plainly the result of the coaction of all the elements of this combination. It is true that the action of these elements may be successive, rather than simultaneous, but the fact that such action is of such character does not in anywise militate against the conclusion. Newbury v. Fowler, 28 Fed. Rep. 454.

The weighty objections in this cause, however, to the validity of the letters patent, go upon other grounds. The defendants, with great vigor and ability, contend that the letters patent are absolutely void because the alleged invention claimed by Mr. Edison has about it no characteristics which would imply the least operation of inventive genius; that the state of the art clearly showed anticipation; that the systems in vogue of equalizing pressure in the distribution of gas and water for general consumption were strictly analogous to the proposed distribution and regulation of the electrical current as described by Mr. Edison as his invention, and had been in use many years; that especially did the prior patents to Werdermann and to Khotinsky and to Lane-Fox, for systems of electric lighting, clearly and substantially, if not literally, anticipate the letters granted to Mr. Edison; and that the treatise of Giroud upon Water and Gas Distribution made known, years before, to the whole world, just what Mr. Edison so many years later claimed

to have discovered with relation to the control and distribution of electrical energy. It will be necessary to examine into the merits of these defenses. If they are well founded, the case of the plaintiff must fall.

In testing them it is important to remember the construction given to the claims of this patent, and the conditions which limit them, as heretofore stated. The defendants insist that the real issue, so far as patentability is concerned, is whether the single circuit covered by the claims in suit, when taken in its simplest form,— such as, for instance, a circuit running from a generator to a single house, with but a dozen lamps for its work,—involves patentable novelty at the date of Mr. Edison's alleged invention. The defendants have the right to criticise and test the validity of the invention by considering it in its simplest form, but it must be the invention as described and claimed by the inventor, and not as it exists in the mind of counsel. To lop off from the invention the limitations and conditions which are embraced in the claims would be to destroy the real substance of the invention itself.

Let us, then, first consider the Werdermann patent, and see if it can be called anticipatory to the patent now under consideration. This is a British patent granted on June 21, 1878, to Richard Werdermann, for an improvement in apparatus for electric lighting. It concerned itself more with the actual mechanism for producing the light itself, than to the construction of the feeders and conductors which were to convey the electrical current to the lamps. It further concerned itself with an arrangement of the conductors so that the current for all the lamps which may be employed shall be compelled to travel exactly the same distance from the generator, so as to equalize the pressure at the lamps. To accomplish the first purpose he simply brings the points of two electrodes into contact under certain conditions. It is not necessary to discuss that part of the patent. To accomplish the other purpose he determined to adopt this method, (I quote his words from the letters patent:)

"So to arrange the parallel circuits in which the lights are included that the light which is the first one or the nearest to the source of electricity on a positive conductor is also the first or nearest to the source of electricity on the negative conductor. But I prefer the arrangement illustrated in the drawings, in which the lamp or light which is first with regard to its position on the positive conductor is last with regard to its connection with the negative conductor. With this arrangement, the electric currents for all of the lamps or lights will have to flow through the same distance."

Upon inspection of the figures and diagrams annexed to the patent itself, it is apparent that the arrangement described is wholly similar to the multiple arc or parallel arrangement, excepting in one particular; and that is that the outgoing current, instead of reaching the nearest lamp, doing there its work, and then returning from it by a conductor equal in length, is only returned after traveling beyond the point where the most distant lamp is situated. In other words, the arrangement is what is technically called the "reversed parallel;" so called because the position of the return conductor is reversed from its position in simple parallel.

Evidently, Werdermann's idea was that in thus compelling the electrical current to pass over or through an equal length and sectional area of a conductor, in going to and returning from each lamp, he completely solved the difficulties of electric lighting arising from the harmful drop in tension. To insure the uniformity and brilliancy of his lamps he inserted at each lamp a "special resistance," as he called it; so that when the lamp was extinguished the special mechanical resistance would still have the same effect upon the electrical current as the lamp would have itself when burning. The idea of a division of a circuit into feeders and consumption conductors, to meet great difficulties, does not seem ever to have occupied his thoughts; still less, the proportioning of the feeder conductors or mains in such a way that all the drop in tension should be localized upon them. It is true that one of the diagrams attached to the patent, to some extent, seems to exhibit a circuit consisting of feeders, with their separate functions, and consumption mains, with illuminating devices. But Werdermann himself, in referring to the diagram in question, says that it does not represent the relative position of parts as they will exist in actual practice, but is only designed graphically to represent the arrangement of their lights, their arrangement of cables and conductors, and the manner in which the division of the current is effected in such manner that each light will be produced or extinguished independent of other lights.

The witnesses on behalf of complainant are very clear in their conclusions that the Werdermann patent is not an anticipation of the Edison patent, and give substantial reasons for their faith. Prof. Chandler says:

"I find that the Werdermann system differs in every important particular from that of the patent in suit: (1) It uses arc lamps, instead of incandescent lamps. (2) It uses a low-tension current, instead of a high-tension current. (3) It employs a constant current, no matter how many lamps are in use, instead of a variable current adjusted to the number of lamps in use. (4) It involves a uniform load upon the dynamo, no matter how many lamps are in use, instead of a variable load adjusted to the amount of energy required at different times. (5) It includes no central station regulation. The current being constant and the load uniform, there is no object in central station regulation. (6) There is no attempt to overcome the inevitable difficulties in distribution, due to distance, by dividing the circuit into two distinct parts,—a distributing or consumption part, and a feeding or supply part. (7) There is no such division of the circuit into (a) consumption circuit, upon which all the lamps are placed, so proportioned in size to its length, and to the number of lamps connected with it, that the drop in pressure will be so small as to be of no consequence, and that the nearest and the furthest lamps from the central station will receive, substantially, the same pressure; (b) feeding circuit, upon which no lamps are placed, designed to supply the current to the consumption circuit, and upon which all the drop in pressure due to distance will be intentionally located. (8) The Werdermann system would require so large a quantity of copper to distribute the current as to make the system absolutely impracticable. (9) The Werdermann system would also be altogether too expensive, as regards the supplying of electricity; there being no central station regulation, but, on the contrary, a constant current."

In this view, Sir William Thomson, Mr. Brevoort, and Mr. Jenks concur.

It seems to me that the design of Mr. Werdermann's invention was so to place the lamps at such equal electrical distance from the generator as to enable any sized consumption circuit to be used. Such invention cannot be adjudged an anticipation of what Mr. Edison did, for such was not his object.

The defendants also depend upon a French patent issued to M. De Khotinsky for improvement in electric lighting, dated March 19, 1875, as an anticipation. Khotinsky says his invention relates to improvements in electric lighting, with a view of obviating the inconvenience of the system proposed heretofore, by reason of which this mode of lighting has not been generally adopted. The first part of the invention is found in peculiar arrangement of the conductors of the electrical current, which permitted the current to pass into each lamp or light independent of the others, so that the variation or failure of light in one lamp has no effect upon the others; and, secondly, the arrangement of the burners of the electric lamps in such a manner that, after the consumption in service of one carbon or other luminous conductor, the current passes automatically into another luminous conductor, and from that into a third, and after the consumption of all the luminous conductors which had been provided the current travels automatically to a spiral, or a conductor of any form, whose resistance is equal to that of the lamp in connection, as described. It is to be noted that this patent was considered by the United States patent office when the Edison patent was granted, and was there overruled as an anticipation. There does not seem to be anywhere in the patent, so far as the phraseology is concerned, any indication that Khotinsky thought of dealing with the difficulties of "drop in tension" in an extended system of lighting. It is true that one of the diagrams attached to the patent seemed to illustrate to some extent, at least, the scheme of Edison; but there is nothing said in describing that drawing which would disclose the law for the proportions of the circuit in regard to the number of lamps connected therewith, nor any data given by which it might be concluded that the lamps would vary from each other in candle power, which variance was to be cured by this invention. Such failure of description or disclosure is fatal to the defendants' claim.

And for this cause alone the Khotinsky patent cannot be relied upon in this case as an anticipation of the plaintiff's patent. It does not anticipate, because it neither describes nor deals with, nor certainly provides for the difficulty, nor prescribes with precision the remedies which form the subject-matter of Edison's invention. In Powder Co. v. Parker, 16 Blatchf. 295, it was held:

"The prior description, to invalidate the patent, must be such as to show the article described in the patent can be certainly arrived at by following it."

In Cary v. Manufacturing Co., 31 Fed. Rep. 347, Judge Acheson says:

"In respect to the prior publications relied on as a defense, we need only say that, in our judgment, they do not fulfill the requirements of the estab-

lished rule that such publications must contain in themselves such a full, clear, and exact description of the invention as, without anything more, will enable one skilled in the art to practice the invention."

In Celluloid Manuf'g Co. v. Chrolithion Collar & Cuff Co., 31 O. G. 519, 23 Fed. Rep. 398, Judge Coxe says:

"The novelty of the invention is not negatived by any of the patents, American or foreign, introduced by the defendants. * * * No one describes, with anything like the accuracy required, the fabric of the complainants. The burden is upon the defendants to satisfy the court that the prior descriptions contain such a clear, full, and exact statement that a person skilled in the art, with the statement before him, could produce the fabric in question. * * * The law requires something more, beyond the mere suggestion, to defeat a patent. Prophecy will not do it. Facts, not theories, are needed."

In Seymour v. Osborne, 11 Wall. 516, it was held that—

"Patent inventions cannot be superseded by the mere introduction of a foreign publication of the kind, unless the description and drawings contain and exhibit a substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains to make, instruct, and practice the invention to the same practicable extent as they would be enabled to do if the information was derived from a prior patent."

It is true that the expert witnesses for the defendants insist that the Khotinsky arrangement of circuits is wholly similar to that described and explained by Mr. Edison in the patent in this suit; but the evidence given upon the same point by the experts for the complainant, Sir William Thomson, Mr. Jenks, and Mr. Brevoort, is directly contradictory, and seems to be more weighty and conclusive. In speaking of the Khotinsky patent, Sir William Thomson says:

"Khotinsky does not suggest anything towards the illumination of towns, or the carrying of the electric energy to considerable distances. He does not contemplate any difference of pressure in the different parts of his circuit. He makes arrangements to provide for one lamp of his system being extinguished without disturbing the others, while the output of the engine remains constant. * * * The difficulties connected with supplying the current, and maintaining approximate enough quality of brilliance among all the lamps, through all the variations of numbers of lamps used in actual practice, * * * were not at all felt by Khotinsky, who in fact gives no indication of applying his system to working at a distance, or of there being any practical difference in the tension in the different parts of his conductors. There is certainly nothing in any part of his patent which gives any indication towards the solution of the problem discovered by Edison."

Prof. Chandler says:

"The Khotinsky patent does not deal with the problem of conveying electricity to a distance, for supplying a large number of lamps, scattered over a considerable area. * * * There is nothing in the language of the Khotinsky patent, when properly translated, to indicate that Khotinsky had considered the question of distance, or that he thought of locating his dynamo at any distance from his lamps. * * * Khotinsky evidently intends to do precisely what Werdermann does,—that is, to maintain a constant current in his system, and to offer to this a constant load,—for he has provided an equivalent resistance, which is to take the place of any lamp which goes out. * * * There is no suggestion of any attempt to overcome the inevitable drop due to distance by a system of feeders, devoid of lamps, upon which this drop is located where it could do no harm. There is no suggestion in the Khotinsky patent of dividing his system of conductors into two parts,—one of which is

to be the consumption circuit, the wires of which are so proportioned with regard to the number and location of the lamps that no drop in tension will occur upon them greater in amount than a negligible percentage; the other, a feeding system, devoid of lamps, upon which all of the inevitable drop due to distance should be located."

Mr. Jenks says Khotinsky does not show or describe—

"Any idea of dividing the conductors, and assigning to each division separate and peculiar functions,—among these functions being that of the intentional loss of a predetermined proportion of the total energy upon the supply conductors,—nor any method for distributing current over comprehensive areas by simply proportioning the conductors."

Mr. Brevoort says:

"There is nothing in the Khotinsky patent that shows that he contemplated supplying any large area, and there is certainly no division of the circuit into two substantial and material portions. distinct from each other,—one, free from translating devices, and adapted to act as a feeder and overcome the distance between the dynamo and the consumption circuit, which latter was to be so proportioned as to insure that the lamps in it would not suffer a loss of pressure of more than five per cent."

If these criticisms upon the patent of Khotinsky are well founded,—and I think they are,—it is very apparent that the scheme devised by him for improvements in electric lighting cannot be taken to suggest in any way the device of Mr. Edison. It does not appear that the difficulty in electric lighting arising from the necessary drop in tension presents itself in this invention at all. Undoubtedly the inventor does speak about the action of one lamp in no wise affecting the action of others; but this he regards as provided for either by the multiple arc arrangement, itself, or by his special contrivance of an automatic resistance equal to the resistance afforded by the lamp previous to any lamp being extinguished. I do not see that the defendants are aided by this invention.

The defendants next rely upon two British patents granted to Lane-Fox in the year 1878, and upon a letter from Lane-Fox to the editor of the London Times, and published in the London Times on December 26, 1878; and they insist that these patents, in connection with the letter, described a system involving the use of a large number of high-resistance incandescent lamps connected in multiple arc, and operated from a central station. They insist that in this system Lane-Fox professedly followed the general methods of distributing gas, and that he describes a system of conductors arranged like gas mains, supplied from a gasworks located at some central point in the system.

The invention in this case is for improvements in obtaining light by electricity, and conveying, distributing, measuring, and regulating the electric current from the same, and in the means or apparatus employed therein.

A careful reading, however, of the description of the invention, as declared in the letters patent, differentiates it, I think, entirely from the inventive device of Mr. Edison. Undoubtedly, Lane-Fox had in mind the difficulties of electric lighting due to drop in tension, but his plan for obviating those difficulties was to enlarge the

system of conductors as they approach nearer to the central station, forming what is generally known as the "Tree System." This may be described as a system of distribution in which the electrical energy starts from the central station on the largest of all the conductors in the system, then divides itself into so many branches as may be necessary to accommodate the groups of lamps to be operated, and which branches diminish in sectional area as the distance from the station increases. He does not depend entirely upon his system of conductors to obviate the difficulty of drop in tension, for which, "as a remedy," he proposes to annex or attach to his system, at various points, Planté batteries, which might act as storage batteries for storing up electricity, and distributing it through his system. Carefully reading the patent, I cannot see that there is any attempt on the part of Lane-Fox to localize or separate the circuit in such a way that a considerable drop of potential is admissible upon part of it, and no perceptible drop is admissible on the other part; that is, there seems to be nothing analogous to Mr. Edison's feeding or consumption circuits. For this opinion I find confirmation in the very clear statement made by Prof. Chandler. In criticising these patents of Lane-Fox, he used this language:

"In conclusion, I would say that I find none of the essential features of the Edison invention in the Lane-Fox patents. The only points of resemblance are the central station, and the large number of incandescent lamps. There is no division of the circuit into two distinct parts. The circuit is all consumption circuit Lamps are shown upon all parts of it. There is no portion of the Lane-Fox distributing circuit which corresponds to the feeders of the Edison system; no portion upon which the inevitable drop in tension due to distance could be intentionally localized, where it would have no influence upon the lamp, and no means are adopted for maintaining equality of pressure at the terminals of the lamp, except by enlarging the conductors systematically as they approach the central station, which is the very plan which Edison practically disclaims in the patent in suit. * * * He has no system of feeders, and he does not anywhere in his system intentionally incur the inevitable drop due to distance, and there render it harmless."

It must be borne in mind that Mr. Edison's invention was to localize the drop in tension, which was inevitable, where it would be perfectly harmless, so far as the operation of the lamps upon the system was concerned. The effect which he produced by his invention was to strip the consumption circuit of all harmful drop in tension, so far as that circuit was concerned. The result is as if no such thing as drop in tension, perceptible in its effect, existed at all. Clearly, the main and chief thing accomplished by Mr. Edison was this division of the circuit. Now, in the Lane-Fox system of electric lighting, the whole circuit is a consumption circuit, from beginning to end. The diagram which he annexes to his patent, and which he refers to in his specifications, clearly shows that all of the circuit was to be used as affording stations for lamps; and his means of overcoming drop in tension, other than the enlargement of his conductors, was the use of supplementary batteries, which were placed throughout the system. It would require the assistance of a vivid imagination to draw an analogy, suggestive and educational in its character, between such a system, so planned

and devised, and to be so operated, and that of Mr. Edison. Save that in both systems conductors and electric energy and incandescent lamps and central stations are used, there is no patent similarity. The intent may have been identical. The means of realization are diverse. If it needs the close and acute examination of skilled experts to discover any similarity between inventions, such necessity would seem to deny the existence of suggestive character in either.

It is well to remark that in passing judgment upon these various inventions, in order that impartiality and exactness may be exercised, it is to be remembered that 10 years ago the science of electric lighting of large areas was in its infancy, and that the application of the knowledge which to-day is common possession, in forming our conclusion of the nature and character of operation of electric energy when chained down to the performance of labor, was then wholly impossible. What those inventions of those days were capable of performing was limited by the knowledge of those days. Some of those inventions may seem to be suggestive now, when we use our present knowledge touching electricity and its characteristics; but 10 years ago they were unsuggestive, simply because, as the fact shows, they failed utterly to suggest. This is the unanimous testimony of all scientists touching the matter.

The defendants, as an essential part of their defense in this case, further insist that the claims of the letters patent involved in this suit were clearly anticipated by prior publication and uses relating to electro-metallurgy, including therein, especially, electroplating and electrotyping. They depend upon Napier's work on Electro-Metallurgy, published in 1867, and upon the testimony of Mr. Weston, and perhaps one or two other witnesses, who were connected in the erection of a plant for electroplating and electrotyping in Newark, and upon a copy of the Scientific American, a newspaper published in New York City, of the date of September 1, 1877, which latter the defendants' claim shows clearly, in a cut of an electroplating plant, the same arrangement and proportioning of wires and conductors, and the division of the circuit into feeder and consumption circuits, to obtain equality of pressure, as Mr. Edison claims in his patent. Their contention, briefly stated, is that in electrotyping and electroplating, and similar applications of electricity, the electric current is distributed by multiple arc; that the necessity for equalizing pressure is fully as great as in electric lighting; and that long prior to the date of Mr. Edison's invention the method employed for equalizing pressure in these operations was the same as that described by him. That we may weigh this claim properly, and arrive at a just estimate of its worth, it will be necessary to consider for a moment just what electrotyping and electroplating are.

"Electro-metallurgy" is a term characterizing all processes in which electricity is applied to the working of metals. Electrotyping was in vogue as a popular amusement as early as 1840, and it was quite the fashionable thing at that date to copy, by the new process which had just been described in the scientific pa-

pers of the day, coins, seals, and medals. The apparatus employed was very simple, and practically is the same to-day. It consisted of a glazed earthenware jar containing a solution of sulphate of copper, and a small porous cylinder containing diluted sulphuric acid, in which a rod or plate of zinc was placed, and which was suspended in the jar. The object to be copied by electricity was attached by a copper wire to the zinc, and immersed in the solution. It thus formed the negative element of a galvanic battery, and a current of electricity passed from the zinc through the liquid in the jar and cylinder to the immersed object, and thence back to the zinc through the copper wire, thus forming a complete circuit. The effect of this electrical action was to deposit upon the object to be coated a thin film of copper, obtained by the decomposition of the copper solution. When the film or incrustation of copper had become sufficiently thick, it was readily removed from the object, and presented a complete fac-simile of it in reverse. A repetition of this operation, with this reversed object as a matrix, resulted in presenting the object itself in natural relief.

Electroplating, another branch of electro-metallurgy, was simply the coating of one metal by another, the deposited metal becoming inseparably a part of the object plated. The process was very similar in its operation to electrotyping. In both processes, now, separate batteries or dynamos are used as the generators of the electrical current, and the current is carried by wires to the tanks or vats or baths in which the object to be plated or copied is immersed. As in the electrotype bath, so in the electroplating bath, there is a liquid containing in solution a metal which it is desired to deposit upon an object temporarily immersed therein. The current of electricity is carried to the bath by means of a plate of metal, called the "anode," which is the same as that in solution. The object to be plated is immersed in the bath, opposite to the anode plate, and the electrical current passes through the liquid intervening between the two. This operation decomposes the liquid, separating the metal held in solution, and depositing it as a thin film upon the face of the object to be plated. The operation is continued until the resultant plating has become of the required thickness, when the plated object is removed from the bath. Looking at these operations generally, and without further explanation, it is exceedingly difficult to draw any analogy between them and the lighting by electricity of large areas, in which the necessary drop of tension is necessarily overcome. It is certainly very obvious that whatever may now be thought of the suggestiveness of the electroplating process or the electrotyping process, in view of what Mr. Edison has accomplished toward the solution of the problem of electric lighting, none of the scientists who in 1879 and 1880 were searching for the solution of that problem ever gathered from them any suggestion or hint towards the solution so ardently sought. It is difficult indeed to see the least possible analogy between a bath or a vat or a tank containing metal in solution, through which an electric current is to be passed—First, for the purposes of decomposition; and, secondly, for a fixing of the decomposed mole-

cules of the metal upon an object temporarily placed in the bath,—with a system of electric conductors, feeding and consumption, running for miles, perhaps, through thickly-settled territories, having upon the consumption circuit incandescent lamps permanently fixed, and in large numbers, usable at pleasure, and wholly beyond the influence of "drop in tension." Certainly, a nonexpert, though never so alert, would scarcely discover resemblance between two things so utterly dissimilar, nor would he be any the more happy in searching for analogy to assist in the solution of a problem touching the distribution of the electrical current. Electroplating and electrotyping, even when the electric current was conveyed from dynamos or batteries exterior to the vat or bath, were, as a rule, carried on within a space of limited dimension. In the plant spoken of by Mr. Weston, in Newark, the feeder wires were but 16 feet in length, and the support upon which articles to be plated were suspended across the bath still less. Here, certainly, was no opportunity for a harmful drop in tension of the current in passing from dynamo to bath. And, besides, in these .operations the current sent through the wires is of so low a tension that it would be utterly futile to consider it as a possible factor in electric lighting. It is true Mr. Weston says that in the construction of the Newark plant, illustrated in the Scientific American, the feeder wires and the supply wires, if they may be so called, were of different sectional area, and were purposely so made that there should be an equality of pressure at the baths. But he is the only one sufficiently bold to make such statement; and, without harshly criticizing it, surely it is remarkable that if he thus solved a problem which was exciting the whole scientific world with its difficulties, and its apparent impossibilities, he should not have made known his success in reaching the true solution, and that he should not have patented that invention, so pregnant with result, for his own peculiar benefit. He applied for, and was granted, other patents, about that same time, all having reference to the use of electricity; but he nowhere and at no time intimates or claims or suggests that he has accomplished the equalizing of electrical pressure by a due and proper proportioning of feeder and consumption conductors. It seems that Prof. Chandler's explanation of the difference of sectional area of the wires in the Newark plant, or as suggested ·in Napier's essay, is the more credible, as it is much more reasonable. Speaking of the fact that the bars or copper rods upon which are suspended the objects to be plated are larger in sectional area than the wires connecting them with the batteries or dynamos, he says:

"There can be no appreciable drop in tension upon them, in so short a distance, which would need the difference in sectional area to overcome; and the difference in size is a mere incident, and due to the necessity of selecting rods large and strong enough to support the weights hung upon them, and short, on account of the limited dimensions of the tank."

All the experts examined by the complainant have answered very fully and completely in reference to the system of electroplating and electrotyping, and as to the information given by Napier in his essay; and they are unanimous that there was nothing, either in the

testimony of the witnesses, or in the processes described, or in the publications referred to, that was similar, or substantially similar, to the invention described in the first three claims of the patent in the suit.   As was said before, the answer to the contention of the defendants with respect to this part of their case is that while, under the light that we have to-day, these processes and this imparted information may seem as if they ought to have suggested something of value, from which, as starting points, a learned electrician should, by successive and logical steps, reason out the result at which Mr. Edison arrived, yet in point of fact they did not suggest any such thing, and were evidently wholly valueless for any such purpose.   And this is evidenced by the fact that the scientists of the day not only did not resort to these alleged processes and these technical works, but absolutely ignored them, as affording any assistance towards the solution of the problem which they were seeking to solve.   It is a comparatively easy task to-day to argue that these various processes and arts and methods and publications ought to have revealed the solution of the problem involved in electric lighting of large territories.   From each may be selected peculiarities, beneficial and unique, that in more or less degree bear resemblance to Mr. Edison's invention.   But the truth is that they did not, conjointly or separately, give birth to suggestion.   The logic of argument, then, must fail to compel conviction, when confronted by the more robust logic of fact.

The defendants further contend that there is no patentable novelty displayed, because the prior methods and systems of, and publications relating to, gas and water distribution for public use, constitute a complete anticipation of Mr. Edison's alleged invention.   Their insistence is that the pressure in the distribution of gas and water was equalized by precisely the identical means adopted by Mr. Edison in his distribution of electricity.

The publications upon which the defendants rely are the works of Clegg, of 1841; two editions of the works of Giroud, of 1867; of Allavoine, published in 1879; the reports of the Philadelphia Gasworks from 1837, 1841, 1848, 1849, 1859, and 1860; and of the works of Du Moncel, published in 1878, relating to the distribution of gas. A number of witnesses were also examined, whose testimony was with reference to distribution of gas, and the means and process adopted to equalize it, in the cities of Newark, Lowell, and Philadelphia.

So far as the distribution of water was concerned, the defendants claim that the statement made by Mr. Church as to the distribution of the water supply in New York; of Mr. Greenough, as to the distribution of water in Boston; and of Mr. Brown, as to the distribution of water in Pittsburgh,—fully sustain their contentions.

It must be admitted that for certainly 50 years back, and more, perhaps, it has been the custom to have, in the distribution of water and of gas to customers distant from the reservoir or holder, independent mains or lines of pipes, from which originally no service pipes were laid, and which were used simply to carry the water

or gas to a point generally in the center of the general system, for the purpose of overcoming the effect of friction by a new supply of the gas or water to be furnished. The theory of the defendants is this, and at first glance it is extremely plausible: That the analogy between the flow of the liquids, gas and water, and the flow of the current of electricity, is exceedingly strong, and almost identical, and that any reputable engineer would necessarily, upon but little thought, adopt, from his knowledge of the distribution of gas and water, the same method and plan for dealing with the electric current. On the other hand, the complainant insists that the problem to be solved is wholly different with regard to water and gas, on the one hand, and electricity, on the other; that in the one case a retardation of the flow by the action of friction was the sole difficulty to be considered; in the other, how to deal with the absolute loss of the current itself became the vital question. Its thorough destruction lay at the basis of the problem which so tried their ingenuity. And they asserted that differences, radical and unexplainable, existed between the ponderable bodies which are called "gas" and "water," and that imponderable and intangible vibratory action of molecules which is called "electricity." Many differences between them were cited upon the argument, the effect of which was necessarily to weaken very much, if not entirely to destroy, the theory that there was a distinct and positive similarity between gas, water, and electricity, which would justify analogy in their treatment. It would be simply impossible to analyze and state here these different theories.

Evidently the questions thus submitted to the adjudication of the court are questions primarily for learned experts, and they were so dealt with in this case. A battle royal has been fought between those who have presented the theories of the defendants, and those who have explained and illustrated the contentions of the complainants. Weighing the testimony as best I can, and after the most careful consideration, I am of the opinion that neither the distribution of water nor of gas, nor the various publications referring thereto, and suggesting methods therefor, could have formed a basis upon which Mr. Edison could have successfully constructed his system. It would be tiresome, in the extreme, if all the opinions advanced by the experts on either side, touching this point, were quoted. I shall simply say that the evidence given by Sir William Thomson, the leading British scientist, upon this part of the case, is so satisfactory, and, as it seems to me, so logical and convincing, that I give it unqualified assent. He says:

"I do not think the analogies known, prior to 1880, between the action or flow of gas and water and of electricity, were sufficient to teach electricians that electricity could be successfully distributed over considerable areas to incandescent electric lamps in the manner and by the means referred to in the tenth interrogatory, so as to maintain uniform candle power throughout the system. I have myself, for many years,—at least thirty-five years,—been familiar with the analogies between the flow of gas or water in pipes, and electricity in conductors, and have explained and illustrated that analogy in many published works contained in my volume of collected papers mentioned in my answer to interrogatory 2. To make a proper working analogy, the pipe through which gas or water flows must be filled with porous or spongy

material, through which the gas or water would percolate when compelled to do so by difference of pressure at the two ends of the pipe. We should then have flow of the ponderable fluid in simple proportion to the pressure, as is the flow of electricity in a conductor. In reality, the flow of gas or water through a pipe is nearly in proportion to the square root of the difference of pressures, but it is also affected by various other circumstances, for which there is no analogy in the flow of electricity through conductors. Thus, in the defendant's translation of Giroud's treatise, (page 615,) we find: 'Coming from the holder under a pressure which is necessarily constant in Paris, 150 mm., for example, the flow of gas is obstructed first by the outlet valves at the works; then, by the turns or elbows of the pipes, by narrowings of pipes of too small diameter, by differences of level; and, finally, by the stopcock of the burner itself; and this obstacle, the last of all, allows the gas to escape from the orifice of the burner at a pressure of hardly more than two or three mm., and fifteen or twenty on burners constructed on false principles. It is between these two extremes that all the phenomena of circulation take place which we are about to discuss in this work.' This is absolutely unlike the problem of electrical distribution. The object of pressure for gas between the works and the place of consumption is merely to bring the gas to the place. The enormous range of pressure from 150 mm. to two or three for the best burners is utterly different from anything that occurs in the electric problem. The efficiency of the gas is not dependent on its pressure, but on its combustion; and it is remarkable, in contrast to the action of electricity, that it gives better results at the low pressure of two or three mm. than at the higher pressure of fifteen or twenty. In the electric light the efficiency of a certain quantity of electricity depends wholly on its pressure; and lamps adapted to work at a pressure of twenty would give, with the same quantity of electricity, ten times as much light as lamps of the same quality adapted to work at a pressure of two.

"In an electric system, delivering electricity from the source at a pressure of 150, and using it at a pressure of three, only one fiftieth of the whole energy would be used, forty-nine fiftieths of it being wasted by the generation of heat in the conductors. The comparison of the flow of electricity in a single conductor, and the flow of water or gas in pipes, set forth in the diagram facing page 292 of the defendants' printed record in this case, represents the almost total loss of energy by the electricity in figure 3, in circumstances analogous to those of the outflow of gas at B in figure 2. The difficulty in making out anything of a quantitative comparison between the two cases is illustrated by the fact that the forces illustrated by the spring balances and repelled disks of figure 3 would be, not in simple proportion to the pressure, but would depend, in a very complicated manner, on the squares of the pressures, and the configurations of the lines of electric force between the disks, and round their edges to the earth. Thus, the lower ends of the springs would be nothing nearly in a straight line, as shown in figure 3, while the levels of the water in the pressure gauges of figure 2 would, as correctly shown, be essentially in a straight line. The electric system essentially involves two conductors, with a difference of potentials maintained between them. This difference of potentials is what is technically, and by English board of trade rule, called 'pressure.' To this there is absolutely nothing analogous in pipes for the distribution of water or gas. * * *

"The equalizing of electric pressure within five per cent. in the consumption circuit, in all varying conditions of the lamps used in different parts of the circuit, and the calculation of the conductors required for this purpose, and for the feeding conductors, after having formed the idea of using feeding conductors, is a problem upon which no light whatever is thrown by anything to be found in these treatises. And in fact, prior to 1881, none of the engineers who attacked the problem of the electric lighting of cities, many of whom were thoroughly acquainted with gas distribution, did propose or show any signs of having invented the system of consumption district and feeders until Edison gave it in his patent 264,642. Even as late as 1885 we find Professor George Forbes, in his Cantor lectures, delivered in the month of February of that year, and published in the Journal of the Society of Arts for October, 1885, giving an elaborate and full comparison of electric distribution with gas dis-

tribution, and describing Mr. Edison's feeder system and patent in the following statement: 'It must be acknowledged that the simple tree system, where all the dynamos are connected in parallel with the mains, presents a very serious obstacle in the rapid fall of potential; the maximum distance of a lamp from the station along the line of conductors, consistent with the economical considerations, being 124 yards, if the pressure required for all lamps is the same.' * * *

"The translating devices used for the electric light are utterly and essentially different from anything used in gas lighting, or in connection with gas distribution. The electric light, of whatever kind, acts entirely by the resistance of an arc, whether of air or of some solid conductor, to the flow of electricity through it. The electric current essentially passes through the lamp from one portion of the system of conductors to another, at a different potential from the first. The difference of potentials of the two is the working pressure of the lamp. In gas lighting the gas simply flows out of the pipe, and burns in the air. The light given depends on the quantity of gas delivered and on the temperature and manner of its burning. It depends on pressure only so far as this influences the manner of the burning. The work done by the pressure on the outflowing gas is infinitesimal in comparison with the work done by the combustion which generates the light. Every time the gas is lighted it is regulated by the user, who lights it and turns the stopcock till he sees the flame to be of the size and brightness which he desires. Doubled or tripled or halved pressure, supervening in the course of a morning or evening, on account of the extinction or the lighting up of other lights fed by the same mains or branches, is controlled by the user, who partially closes the stopcock when he sees the light flaring up too high, and opens it wider when he finds his light too low. This control by the stopcock does not in the slightest degree impair the economy or alter the quality of the light, however great the difference of the supply pressure may be. There is absolutely no analogy in gas to the electric bridge from one main to another main, such as is constituted by the incandescent light. The incandescent light has no regulator in connection with it. It is either off or on. The ordinary user has no means of altering the difference of potential in virtue of which it acts. The regulation of the pressure, or difference of potentials, is required for two purposes: (1) To prevent the lamp from being destroyed by too high pressure; (2) to keep up its brilliance to the proper degree. No such reasons demand equalization of pressure for gas, and the only reason for requiring a rough approximation to uniformity of pressure is to save the user the trouble of regulating by his stopcock, or to save the expense incurred by too much gas passing, or by the breakage of a lamp glass when a light is allowed to flare up without being noticed. With these well-known facts in every one's mind, it is not to be wondered at that electrical engineers did not look to gas distribution for suggestions as to how best to arrange the pairs of conductors required for the electric lighting of a city."

I do not think that the witnesses for the defense have by their statements and arguments in any wise weakened these reasons, or affected these conclusions. Of course, it is exceedingly hazardous for one not an expert to express an opinion on a question so wholly within the domain of scientific exposition; and the hesitation to do so would be unconquerable were it not that even the able and learned witnesses for the defense, when speaking of the problem of the distribution of electricity on a large scale in 1880, and its probable solution, were positive that there was a serious difficulty involved, which was apparently insuperable, and Dr. Morton did not hesitate to challenge as impossible the statement that Mr. Edison had really accomplished what he claims, even after his invention was made public; and yet Dr. Morton and the other most learned witnesses must have been thoroughly aware of the means adopted to equalize the pressure in gas and water distribution.

At that very time it was common knowledge with them. Yet, knowing what that method and those means were, these gentlemen not only failed to derive assistance from those methods, or to apply their knowledge to the distribution of electricity, but absolutely doubted, even after the announcement of Mr. Edison's successful experiment, whether it could possibly be true. At that time they could have had no faith in the educational power of the methods of gas and water distribution in their application to the distribution of the electric current.

The answer, I think, which must be given to this part of the defendants' case,—and in this I include, also, the defense which is based upon the alleged anticipatory system of equalizing pressure in electrotyping and electroplating, and upon the publications thereto relating,—is this:

"That while it is admitted by the experts on both sides, in this case, that all the learned electricians of the world, in 1880, were individually engaged, each in his own way, in attempting to solve the problem of the distribution of the electric current over large areas, so as to be successful, not one of them, so far as the testimony in this case goes, and so far as our knowledge extends, ever thought of adopting the means which it is alleged was used to equalize the pressure in water and gas distribution, or to equalize the pressure in electrotyping or electroplating, to overcome the harmful drop in tension, necessarily found in sending the electric current to a large number of incandescent lamps. Surely, if these were anticipations, or if they were so educational in their character and in their effect as is claimed by the defendants to-day, we would have seen the practical result in the operations of the minds of scientific gentlemen scattered all over the world, who were diligently seeking to solve a problem which, notwithstanding all this previous knowledge, seemed to them practically unsolvable."

There were other patents and publications mentioned by the defendants, and some criticism made upon the original proceedings in the patent office, but I do not think it is necessary to consume time in discussing them. I have gone over what seemed to be the strongest points of the defense,—points which were relied upon at the argument,—and my conclusion is that they do not successfully disprove the claim which Mr. Edison has made to be the first inventor of the combination described in these letters patent. I think it is clearly proved that he was the first to conceive of such an arrangement and proportioning of the consumption and conducting wires of a circuit that the inevitable result would be to secure uniformity of pressure throughout the whole system. He was the first to divide a circuit covering a large area into smaller consumption circuits, in which the drop in tension would be negligible, without the expense of a very large sum of money in increasing the copper of his wires. He was the first to obtain the equalization of candle power. He was the first to supply his consumption conductors with feeding conductors set apart for that purpose only. He was the first to localize upon feeding conductors the drop in ten-

sion, so that the loss upon the consumption conductors was always negligible.

It is difficult—impossible, perhaps—to describe what invention is. If invention implies something more than a mere change of form or arrangement or mode of use; if it be the result of inventive, as distinguished from mechanical, skill; if it be the result of the operation of the intellect, not following the beaten track, but striking out into some new direction, and achieving some new triumph; if it be the resultant of the exercise of the creative skill and genius in harmonious combination,—then I think Mr. Edison, so far as the matters involved in this suit are concerned, should be termed an inventor of high order.

The defendants deny infringement. Considerable testimony was taken on both sides with reference to infringement, and, as usual, there is some contrariety of statement; but the weight of evidence shows clearly that the defendants had adopted the system of electrical distribution which Mr. Edison had described in these letters patent, and in so doing had clearly infringed the claims now in suit. It is not necessary to consume time in discussing the evidence on this point. Some technical questions touching the pleadings in the cause were presented at the opening of the argument; but, as leave was given to make such amendments as might be necessary to present the real merits of the controversy, they may be regarded as out of the case.

There must be a decree as prayed for in the bill.