## GENERAL TALKING PICTURES CORPORATION et al. v. AMERICAN TRI-ERGON CORPORATION et al.

### No. 5714.

Circuit Court of Appeals, Third Circuit.

Feb. 18, 1938.

Rehearing Denied June 3, 1938.

S. E. Darby, Jr., of New York City, and E. E. Berl, of Wilmington, Del. (Ephraim Berliner, of New York City, of counsel), for appellants.

Page S. Haselton and S. Mortimer Ward, Jr., both of New York City, for appellees.

Before THOMPSON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BIGGS, Circuit Judge.

Suit was brought in the District Court pursuant to section 4915 of the Revised Statutes, as amended, 35 U.S.C.A. § 63, to compel the Commissioner of Patents to issue a patent to American Tri-Ergon Corporation, one of the appellees, as assignee of Engl, Massole, and Vogt, the three individual appellees, German inventors.

A brief history of the events leading up to the filing of this suit is necessary for comprehension of the complicated issues involved. Accordingly, we state that upon September 18, 1919, Dr. Lee DeForest, the individual appellant, filed his application, Serial No. 324,683, in the United States Patent Office for letters patent for "Means of Recording and Reproducing Sound." Letters patent of the United States, No. 1,-446,246, based upon this application, were issued to DeForest on February 20, 1923. The application referred to showed two possible sources of light energized by high frequency currents which in turn were to be modulated by varying currents set up by and in accordance with sound waves. In conjunction with other apparatus, such sources of light as indicated in the application were to be used for recording sound waves photographically. The two sources of light were referred to in this application as respectively, "a small incandescent filament lamp," and "a small arc lamp." In a divisional application, Serial No. 423,276, filed in the Patent Office upon November 11, 1920, divided from this parent application, DeForest showed as his source of light "a small arc lamp" and gave the description of a process whereby the lamp was to operate to the end that sound might be photographically recorded and thereafter reproduced.

The specifications of this application and of the patent subsequently issued thereon, United States patent No. 1,482,119, are set out hereafter. Claim 5 of the patent is as follows: "Means for photographically recording the sound waves, comprising an electrically lighted lamp, means for constantly supplying high frequency oscillating current to said lamp to light the same, means for controlling said lamp by and in accordance with sound waves, and means for directing the light from said lamp to a sensitized element."

Claim 6 is: "Means for photographically recording the sound waves, comprising an electrically lighted lamp, means for constantly supplying high frequency oscillating current to said lamp to light the same, means for controlling said lamp by and in accordance with low frequency currents, and means for directing light rays from said lamp to a sensitized element."

These two claims were added by DeForest by amendment to his divisional application, the amendment being filed in the Patent Office upon April 20, 1922.

On April 4, 1923, four additional claims were added by DeForest by further amendment to his application, and these claims were numbered in the issued patent as 7, 8, 9, and 10. They are as follows:

"7. Means for photographically recording sound waves comprising an enclosed

luminous gas discharge device, means for constantly maintaining said device effectively luminous, and means for varying the luminosity of said device by and in accordance with sound waves, and means for directing the light from said device to a sensitized element.

"8. Means for photographically recording sound waves comprising an enclosed luminous gas discharge device, means for constantly maintaining said device effectively luminous, and means for varying the luminosity of said device by telephone currents, and means for directing the light from said device to a sensitized element.

"9. The method of photographically recording sound which comprises varying the luminosity of an effectively constantly luminous enclosed gas discharge device by and in accordance with sound waves.

"10. The method of photographically recording sound which comprises varying the luminosity of an effectively constantly luminous enclosed gas discharge device by and in accordance with telephonic currents."

The claims quoted above, 5 to 10, inclusive, are for the invention here at issue and constitute the counts of the issue.

Upon June 2, 1919, the individual appellees, Engl, Massole, and Vogt, filed a joint German application for a patent for a "Process of Making Photophonograms";[1] upon June 3, 1919, they filed an additional joint German application for a patent for a "Process of Making Photophonograms";[2]

[1] Extracts from German application of June 2, 1919:

"Process of making photophonograms.
* * *

"The invention provides as source of light, the use of the radiation that rarified gases emit under the influence of electric excitation, a known circumstance which in physics is called glow light discharge. * * *

"It can easily be seen that the use of glow discharge in the way here sketched is of decisive importance. First, in contrast with the conditions with an arc discharge, the electrical output necessary for maintaining the discharge is considerably less so that the alternating currents excited by the sound proceeding which are never too strong are still sufficient in relation to the mean energy consumption to produce a suitable effect on the discharge operation. (Arc discharges have already been used for similar purposes, attention being called to the Ruhmer experiments with carbon arcs and mercury vapor lamp.) Moreover with arc discharge it can be said that there is according to definitions a greater development of heat at the electrodes: this causes a not to be under-estimated inertia of the whole discharge operation which with the requirement that the source of light shall follow the most rapid acoustic frequencies is very much of a hindrance. That the glow light discharges have the power of following the most rapid electric variations is evident from the known use of the Gehrcke glow light oscillograph tube for testing high frequency oscillations. Of necessity, the fluctuations of the discharge, which occur with the arc on account of lack of homogeneity and presence of impurities in the vaporizing electrode material, are prevented with the glow discharge. The gas used in the luminous tube is so selected that the length of wave of the light emitted is as effective as possible photographically.

"Claim:

"Process of making photophonograms, especially for the purpose of acoustic cinematography, characterized in that a glow light discharge is used as acoustically impressed source of light."

[2] Extracts from German application of June 3, 1919:

"Process of making photophonograms.
* * *

"In the case shown in Fig. 1, side variation is used. The negative glow light is there used, appearing at the cathode of a glow light tube R when it has the shape of a long straight wire (d in Fig. 1) or a narrow metal strip. The length of this cathode light is reasonably proportionate to the discharge current. The phenomenon that even high frequency discharge operations take place without much inertia, has been used for a long time as Gehrcke glow light oscillograph for photographic testing of alternating current. In the case shown in Fig. 1, acoustically impressed high frequency is provided as glow light current which causes a luminous layer of varying length on both the electrodes alternately acting as cathode. The pencil of rays acting on the film is made the desired dimensions by a lens system 1 and a slit. By means of a reflector not shown, the light intensity acting on the film can increase. For answering the purpose, the amount of light projected is so great that the film is overexposed at the illuminated places. The developed film then has the appearance of Fig. 3. If instead of high frequency, acoustically im-

and on April 4, 1921, they filed a joint application, Serial No. 458,631, for the grant of letters patent of the United States, entitled "Means for Recording and Reproducing Sound." [3] This title was subsequently changed to "Means and Method for Photo-

pressed direct current is used as glow light current the film will have the appearance of Fig. 4. * * *

"Claims:

"1. Process for making photophonograms according to the application of May 29, 1919, characterized in that the varying length of the cathode glow light causes transverse shadows of varying length on the film. * * *"

[3] Extracts from application of German scientists for United States patent:

"Method for the Production of Photophonograms, particularly for the purposes of acoustic kinematography of which the following is a specification. * * *

"For the purposes of acoustic kinematography there has been used hitherto a source of light generally an arc which is adapted to be influenced by sound vibrations under definite conditions.

"The use of arc discharges for the photographic recording of sound vibrations has however the disadvantages that owing to the inertia of the arc comparatively large vibrations or resistance are required to an appreciable influence which is sufficient for photographic purposes. The further difficulty, of ensuring the required constance in the intensity of the light and in particularly of preventing the arc from becoming totally extinguished periodically, has hitherto not led to a practically satisfactory method of enabling the optical and particularly the photographical recording of sound waves for the purposes of acoustic kinematography. * * *

"This invention provides means for producing photophonograms, particularly for acoustic kinematography, by means of a source of light which ensures solely the influencing by sound waves without bringing itself any source of error into the procedure. With this object in view the glow light discharge known of itself for other purposes and which is dependent on the strength of the current in the discharge tube is used as the source of light. As glow light tubes can be operated by small currents, relatively and absolutely small alterations of resistance suffice, in contradistinction to the hitherto known sources of light, in order to obtain great fluctuations of intensity with a sharper and more rapid control of the intensity of the light. Consequently the most accurate and the finest photographic recording of the sound vibrations is possible.

"The photographic influence upon the moving strip of film, sensitive to light, must be effected in such a manner that, by means of acoustically controlled source of light (glow light), linear transverse blackenings are produced which stand perpendicular to the direction in which the strip of film is fed forward.

" * * * Owing to the small amount of electrical power necessary to keep up the glow light discharge only small alternating currents excited by the sound operation are required for their control, and are sufficient to allow the source of light to follow the most rapid of acoustic frequencies. The gas used in the light tube is preferably so selected that the wave length of the light emitted has the best possible photographical effect.

"The method for the lateral variation of the width of the blackening can, as shown diagrammatically in Fig. 1, be carried out in a manner that the negative glow light is used which is produced at the cathode of a glow light tube R, when it has the form of a long straight wire d or of a narrow strip of sheet metal. The length of this cathode light is fairly in proportion to the discharge current. * * *

"We claim:

"1. A method for the production of photophonograms in particular for the purposes of acoustic kinematography according to which a glow light discharge which is controlled by sound vibrations is used as the source of light.

"2. A method for the production of photophonograms, especially for purposes of acoustic kinematography, according to which a glow light discharge which is controlled by sound vibrations is used as the source of light, the acoustic variation of the blackenings being effected by the negative glow light of a linear or equivalent cathode so that transverse blackenings of different length appear on the film.

"3. A method for the production of photophonograms, especially for purposes of acoustic kinematography according to which a glow light discharge which is controlled by sound vibrations of the blackenings being effected by the negative glow light of a linear or equivalent cathode so that transverse blackenings of different length appear on the film, a capillary being used as a glow light tube in order to change the lighting or illuminating intensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film.

"4. A method for the production of

804

graphically Recording Sound." Foreign letters patent were duly issued to the individual appellees on their German applications and were published on February 6, 1923.

Upon January 29, 1924, the United States Patent Office issued letters patent No. 1,482,119, to DeForest Phonofilms, Inc., as assignee of DeForest, based upon his divisional application. The appellees Engl, Massole, and Vogt, upon learning of the grant of the patent to DeForest Phonofilms, Inc., proceeded to amend their pending application, copying into that application claims 5 to 10, inclusive, of the issued patent No. 1,492,119. Thereupon an interference was declared in the Patent Office between the issued patent and the pending application of Engl, Massole, and Vogt. The rights of the three individual appellees under their application filed in the United States Patent Office were ultimately assigned, through various steps of assignment which need not be detailed here, to the appellee American Tri-Ergon Corporation. In the interference, application was made by the appellees to shift the burden of proof to DeForest, since the three individual appellees, under the provisions of the Nolan Act, March 3, 1921, c. 126, § 1, 41 Stat. 1313, 35 U.S.C.A. § 80, were entitled to claim June 2 and June 3, 1919, the date of the filing of their corresponding German applications as the dates of the constructive reduction to practice of their invention in the United States. This application was granted and DeForest was made the junior party to the interference. After the evidence of the parties to the interference was taken, upon December 1, 1927, the Acting Examiner of Interferences awarded priority of invention of the subject matter to De-

Forest. Upon appeal, the Board of Appeals affirmed the decision of the Examiner. The suit to the District Court followed and the learned District Judge, after hearing, and upon proofs which included not only the testimony taken in interference but certain additional testimony as well, held for the appellees, and that the corporate assignee, American Tri-Ergon Corporation, was entitled to receive a patent for the invention as specified in and covered by claims 1 to 6, inclusive, of the application of Engl, Massole, and Vogt, such claims being in fact identical with claims 5 to 10, inclusive, of DeForest patent, No. 1,482,119.

The Issues Presented.

It is conceded by the parties to the litigation that if there be anything patentable in the claims at issue, it must lie in the source of light prescribed which must be capable of being modulated by sound waves imposed upon the electric current, which, in turn, animates the source of light. All additional devices and means to that end, whether disclosed in the application of Engl, Massole, and Vogt or by the DeForest patent, were well known prior to 1919. The difficulty of recording sound upon motion picture film or some other suitable medium in such a manner as to enable it thereafter to be reproduced as sound lay in finding a source of light capable of being delicately modulated by the electric current by which it was animated, and which in turn was subject to variations of sound. The individual appellees in their application specified a glow lamp as this source of light for recording sound for reproduction. In their application in the United States Patent Office they stated: "With this object in view the glow light discharge, * * * which is dependent on

photophonograms, especially for purposes of acoustic kinematography according to which a glow light discharge which is controlled by sound vibrations of the blackenings being effected by the negative glow light of a linear or equivalent cathode so that transverse blackenings of different length appear on the film, a capillary being used as a glow light tube in order to change the lighting or illuminating intensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film, the glow light tube being inserted directly in the anode circuit of the (last) reinforcer tube when a reinforcing device is being used.

"5. A method for the production of

photophonograms, especially for purposes of acoustic kinematography according to which a glow light discharge which is controlled by sound vibrations of the blackenings being effected by the negative glow light of a linear or equivalent cathode so that transverse blackenings of different length appear on the film, a capillary being used as a glow light tube in order to change the lighting or illuminating intensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film, the glow light tube, when a reinforcing device is used, being coupled in a transformer like and variable manner with the anode circuit of the (last) reinforcer tube."

the strength of the current in the discharge tube, is used as the source of light. As glow light tubes can be operated by small currents, relatively and absolutely small alterations of resistence suffice, in contradistinction to the hitherto known sources of light, in order to obtain great fluctuations of intensity with a sharper and more rapid control of the intensity of the light. Consequently the most accurate and most delicate photographic recording of the sound vibrations is possible." Their application recognizes in express language the disadvantages of arc discharges for the photographic recording of sound owing to the inertia of the arc. In short, their invention is based upon the glow lamp. Their application discloses an operable system, one which is shown by the testimony to function precisely and perfectly with regard to the end in view.

The specifications of DeForest's light source disclosed by him in his patent are as follows:

"In accordance with my present invention I employ a small arc lamp, preferably consisting of two heavy tungsten ball electrodes, separated by a small gap, for example, 0.5 millimeter, mounted in the small vessel, either evacuated or filled with some gas, such as nitrogen, mercury vapor, etc., to make the light from such arc as rich as possible in ultra violet rays. The light rays from the arc lamp pass through the lens in the usual well known manner and in addition thereto, if desired, through a color filter, which color filter is preferably of a dark blue, as I have found that the best results of recording sound waves photographically are thus secured. A photographic film is passed by the lens and film respectively in the usual well known manner and the light emanating from the lamp is recorded on the film, preferably in the nature of a minute ray obtained from a pin point aperture or focused to a point by a lens. I energize the arc lamp from a source of high frequency current, the frequency of which must be well above the audible limits and modulate the high frequency currents supplied the arc lamp with alternating or pulsating currents set up by and in accordance with sound waves * * * ."

The contentions of the appellees frame the first issue before us. The appellees urge that the specifications of the DeForest patent disclose that his light source was not operable as a means of photographically recording sound because he has described an arc lamp as that source of light. They contend that the arc lamp described by DeForest, though operated in a tube filled with gas, possesses such inertia that the light therefrom does not increase or decrease as the current through the arc increases and decreases, thereby creating a persistence of illumination totally unadaptable for photographically recording sound; that if an arc lamp be operated as one skilled in the art would operate it, the great part of the light from the lamp would come from the incandescence of the electrodes; and that though there is glow light or negative glow surrounding the balls of the electrodes which might respond to frequencies of current, such light would be completely overpowered by the light created by the incandescence of the electrodes themselves and thus rendered unavailable for recording sound photographically. We do not doubt that one skilled in the art of operating an arc light for purposes of illumination would operate it in the manner suggested by the appellees. The appellees take the position that such operation is required by the plain intent and meaning of the specifications and original claims of the DeForest patent and that numerous details so indicate. For example, it is pointed out that the space of 0.5 millimeter prescribed by DeForest as a desirable distance between the electrodes of his tube is peculiarly applicable to an arc discharge as such is commonly understood to be. Since it is proposed that the tube be operated "either evacuated or filled with some gas," it is contended that the gas to be put into the tube shall remain at atmospheric pressure, which creates a condition admirable for such arc discharge, but which will not permit a glow discharge or negative glow to be maintained. The appellees also contend that the gases specified to be used in the DeForest tube are not desirable for glow light but are admirable for the arc discharge referred to. They point out that heated tungsten is not desirable for producing ultra violet light, since at the heat necessary to produce ultra violet light the tungsten will vaporize and boil away. Referring to the pin point aperture described in the DeForest patent as an alternative to a lens to focus the light, the expert witnesses for the appellees state as their opinion that it would not be possible to focus the light from a glow lamp through such an aperture on a film, but that a pin point aperture would aid in focusing light from an arc lamp upon a film. These wit-

nesses make numerous other observations tending to support the appellees' position. We think that these need not be detailed here. To put it briefly, the appellees contend that DeForest properly described a device operable as an arc light, but not a glow lamp or a lamp operable so as to produce the glow discharge necessary for the end described. That failing in this, he has failed to describe a light source capable of being operated in such fashion as to record sound photographically.

On the other hand, the appellees make very plain the peculiar adaptability of the glow lamp as described by them as a source of light for photographically recording sound, and state that the methods prescribed by them in their applications, both in Germany and the United States, are clearly and precisely adapted to the ends which they seek to accomplish. We hold a similar view.

In the interference proceedings Dr. Holburn, one of the witnesses for the appellees, testified to extensive ex parte experiments made by him in conjunction with Dr. Lederer, at the request of the appellees. These experiments consisted of attempts upon the part of Drs. Holburn and Lederer to use tubes, some somewhat similar to, some almost identical with, the tube described by DeForest for recording and reproducing sound. It is the sense of Dr. Holburn's testimony that he found it impossible to cover fully the heavy tungsten ball electrodes prescribed by DeForest with glow discharge without rendering them incandescent, with the result testified to by the appellees' witnesses, namely, that light from the incandescent electrodes overpowered and rendered useless the glow discharge which by itself might have been capable of recording sound. Dr. Holburn also made clear his conclusion that as soon as the electrodes became incandescent any opportunity to make use of the glow discharge surrounding the electrodes disappeared. But it is equally a fact, and Dr. Holburn admitted it, that if the electrodes were not heated to a disturbing incandescence but were surrounded by the glow, the light source of DeForest could be used for recording sound photographically. Dr. Robert W. Wood, Professor of Experimental Physics at John Hopkins University, largely corroborated the testimony of the previous witnesses for the appellees. It is notable, however, that Dr. Wood, upon being asked a question pertinent to this issue upon direct examination, replied: "Yes. I think you could record speech with an arc operating in this way if you didn't employ light from the tungsten electrodes, but only employed the light from the flame of the arc. I think the light in the flame of the arc would respond to the microphone, and therefore could be used for recording speech; but not the light from the electrodes."

The ex parte experiments heretofore referred to, conducted by Drs. Holburn and Lederer, were repeated, inter partes, with substantially the same results. The films used in the experiments were projected subsequently with no discernible reproduction of sound. Experiments in support of the operability of his device were made, inter partes, by DeForest and his assistants. Three tubes were produced and used in these experiments. Each tube contained two tungsten electrodes (described by DeForest as being in the shape of balls) and the electrodes in each tube were separated respectively $1\frac{1}{2}$ millimeters, 1 millimeter, and $\frac{1}{2}$ millimeter. The tubes contained a mixture of nitrogen and argon gas under a pressure approximately equivalent to a column of 6 to 10 millimeters of mercury. The three tubes were cylindrical in shape. The ends of the electrodes were placed upon arms bent at right angles to their main supports which were lengthwise of the tubes so that the axes of the gaps between the electrodes were at right angles to the axes of the tubes. The electrodes were placed as close as possible to the curved ends of the tubes. This precise construction is not described or disclosed in the patent. For example, the drawing accompanying the patent shows a spherical vessel, while the tubes used by the appellants in the inter partes tests were cylindrical. The so-called "balls" at the ends of the tungsten electrodes were in fact flat rather than spherical. The supports for the electrodes, extending the axial directions of the tubes, were of unusually heavy construction, due to the fact that these members were covered with sleeves of some ceramic insulating material tending to have the effect of preventing any flickering along the supports and to concentrate the glow around the electrodes, but this seems to us to be of comparatively slight import, since such insulation need not be specified in application or patent, not being essential to the success of the device described.

DeForest also, in setting up his apparatus for making the inter partes tests re-

ferred to, made use of collateral devices more modern and efficient than those available to him during his periods of experimentation. These changes in apparatus, however, consisted largely of engineering improvements. It must be pointed out that the question before us is one of priority of invention of light source, and other issues are not largely material.

The inter partes tests conducted by DeForest resulted in photographically recording sound upon a film, and this recording was subsequently reproduced in a projection room with reasonably efficient results. The light source used by DeForest was substantially in accordance with that specified in his patent. It should be noted that DeForest operated his lamp during the inter partes tests in such a way that the electrodes did not approach incandescence and that the glow discharge surrounded both electrodes in the tube. So operated the lamp did not display the persistence of illumination referred to as inevitable by the appellees' witnesses, but the glow faded immediately upon the diminution or withdrawal of the electric current.

We think that too much emphasis has been put upon the comparatively inept language used by DeForest in his description of the light source used by him in contrast with the almost startling clarity and precision of the words used by Dr. Engl and his associates in describing the nature of their light source and its operation. We believe that the real gist of the controversy is as follows: DeForest's lamp possesses attributes of both glow light and arc light. The arc lamp described by him may be operated in such a manner that the electrodes will never come to incandescence, but will in fact give off the glow discharge necessary for photographically recording sound. On the other hand, his lamp may also be operated as an arc light, in which case when the electrodes have reached incandescence the functional performance of the source of light is strictly that of an arc lamp, and it will not operate successfully to the ends described in the patent.

The problem before us, however it be

put, remains the same. Is it the case that one skilled in the art of photographically recording sound, as that art existed when DeForest filed his parent application upon September 8, 1919, would have recognized that the light source described by DeForest was to be operated in such a way as to achieve the glow and not the illumination from heated electrodes. In our opinion such would have been the case.

Several items of evidence lead us to this conclusion. First, the inter partes experiments conducted by DeForest, whereby he recorded sound upon a film. Second, his original application lays emphasis upon the disadvantages of large, hot electrodes and suggests means whereby such an unfavorable result may be avoided. Third, he makes reference to the use of gas, such as nitrogen, within the tube, in order that the light from "the arc" may be as rich as possible in ultra violet rays. The discharge must pass between the electrodes and through the gas in the tube. By the phrases used, DeForest indicates that he is looking to the ionization of the gas, rather than to incandescent electrodes as his source of light; to the glow, rather than to the hard persistent illumination of heated tungsten. The use of the word "arc" may not have been an entirely fortunate one, since that word may be used to describe discharges passing between incandescent electrodes as we have indicated above, but used generically that word also means the bridge or bow of ionized gas created by the passage of an electric current between "cool" electrodes as in a glow lamp. [4] Fourth, claims 5 and 6 of the DeForest patent describe an electrically lighted lamp and "means for controlling said lamp by and in accordance with sound waves." The phrase "an electrically lighted lamp" here used, while broad enough to be descriptive of an arc lamp, is also sufficiently broad to include a lamp with a glow discharge or even a true "glow lamp." The electrically lighted lamp referred to obviously could not be operated as a true arc lamp with incandescent electrodes, since so operated the light source could not be controlled in accordance with

---

[4] It is interesting to note in this connection that Webster's New International Dictionary, 1926 Edition, defines the word "arc" as: "A sustained luminous glow sometimes having the appearance of a bow or arc of light (whence the name) that is formed under certain conditions when a break is made in an electric circuit. The points between which the arc is formed may be of metal or, as in the ordinary arc light, of carbon. The E. M. F. must be sufficient to overcome the contact resistance between the terminals and the intervening layer of gas, and the current sufficient to heat the gas and maintain it in incandescence. * * *"

sound waves. It should be noted that the two claims referred to were added by DeForest by an amendment to his divisional application, this amendment being filed in the Patent Office upon April 20, 1922, and not at the time referred to in the bill of complaint, that is to say, after the publication of German letters patent to the individual appellees which occurred upon February 26, 1923. Fifth, the term "arc lamp" has been used generically to describe lamps which were in fact glow lamps rather than arc lamps; for example, mercury vapor lamps. [5] Sixth, the phrase "either evacuated or filled with some gas" used in the DeForest patent in our opinion by no means indicates that the tube must be either evacuated or filled with gas at atmospheric pressure, as contended by the appellees. Such words do not exclude the use of gas at far less than atmospheric pressure. Gas at pressure much less than atmospheric would none the less fill the tube. Seventh, and upon this we lay much emphasis, the initial or primary state of the operation of the lamp described by DeForest (let us say from the time current is first applied until the electrodes approach incandescence) is identical with the operation of the glow lamp described by Engl, Massole, and Vogt. This initial process is nothing more or less than the ionization of gas molecules by the electric current passing through the gas between the electrodes of the tube, resulting, whether it takes place in DeForest's arc lamp or in the appellees' glow lamp, in the glow discharge suitable for photographically recording sound. In the DeForest lamp the glow takes place around the electrodes and is available for the purposes stated in the patent prior to the time the electrodes approach incandescence and a true arc ensues. In the lamp of the individual appellees the glow occupies greater space within the tube and the device is therefore more efficient than DeForest's. Efficiency of operation, however, is not the question before us. We are concerned primarily with the question of whether a source of light, operable to give the requisite glow discharge, has been disclosed by DeForest. Eighth, and last, the lamp described in the DeForest patent, operated with proper application of amperage and voltage, will continue to furnish the glow surrounding the electrodes and need never reach that point of operation where the glow is overborne by the light from the large hot electrodes.

We have weighed most carefully the learned and carefully reasoned opinion of the district judge and that of the Exchequer Court of the Dominion of Canada, quoted with approval by the court below. It seems to us that the latter decision referred to lays too great an emphasis upon exactness of language, of what might be termed niceness of expression. An inventor struggling with the beginnings of a new art is not required to exercise too great a degree of prescience and describe in the language of later years ideas now well known, but just beginning to be talked about in scientific terms at the time of his invention. DeForest's language was inaccurate and fumbling compared to the precise scientific descriptions of Engl and his associates. The technique described by DeForest does not represent the high degree of art which Engl, Massole, and Vogt display in their application. The fact situation in the case at bar is somewhat analogous to that of The Telephone Cases, Dolbear v. American Bell Tel. Co., 126 U.S., at page 536, 8 S.Ct. 778, 783, 31 L.Ed. 863, in which it was stated by the Supreme Court: "The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection; it is enough if he describes his method with sufficient clearness and precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation." The principle enunciated is applicable to the circumstances of the case at bar. It is a principle which has been frequently stated. General Electric Co. v. DeForest Radio Co., 3 Cir., 28 F.2d 641; Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463; Bowers v. San Francisco Bridge Co., C.C., 91 F. 381; Edison Electric Light Co. v. Westinghouse, C.C., 55 F. 490.

In our opinion DeForest disclosed a source of light operable to produce the requisite glow discharge or negative glow by one skilled in the art photographically to record sound for reproduction; that he is therefore entitled to claim at least November 11, 1920, the date of his divisional application as the date of his constructive reduction to practice, if not September 8,

---

[5] The Board of Appeals in this connection refers to "Electric Arcs" by Child, published by D. Van Nostrand & Co., 25 Park Place, New York, 1913, p. 87.

1919, the date of his parent application in which his so-called arc lamp was originally disclosed. McCreery Engineering Co. v. Massachusetts Fan Co., 3 Cir., 195 F. 498; Walker on Patents, 6th Ed., 188 B; Hulett v. Long, 15 App.D.C. 284. Under the provisions of the Nolan Act, 35 U.S.C.A. § 80 et seq., however, the individual appellees, Engl, Massole, and Vogt, may claim and do claim June 2 and June 3, 1919, as the dates of their constructive reduction to practice in the United States of the invention in issue. Can DeForest go further and properly support the proposition which he has advanced, namely, that he conceived the invention in question upon October 12, 1918, and pursuing his conception with due diligence until his work culminated in the applications referred to, is thereby enabled to claim priority of invention? Upon this question the Examiner of Interferences found in DeForest's favor, the Board of Appeals sustained the Examiner's decision, but the District Court found otherwise, awarding priority of invention to the individual appellees, Engl, Massole, and Vogt. This question turns largely upon the effect to be given to a certain sketch allegedly made by DeForest on the steamship Carmania upon October 12, 1918, and his subsequent acts calculated to reduce his conception to practice.

### DeForest's Sketch Made on the Steamship Carmania in 1918.

The circumstances under which this memorandum was made and came into evidence are somewhat unusual. Upon October 6, 1918, DeForest and his patent attorney, Samuel E. Darby, Jr., sailed from New York on the steamship Carmania, a ship of the Cunard Line, under British registry. DeForest testified that upon October 12, 1918, while at sea, he engaged in a conversation with Darby upon the subject of ways to record sound photographically. That to illustrate his views he produced from a book of poetry which he was carrying a piece of "Carmania" stationery, upon the first sheet of which was written a poem of his own composition, and that he thereupon wrote down, upon the clean side of this first sheet, three possible light sources to be used to record sound photographically, and drew upon the bottom of the paper a diagram showing how such should be used. DeForest wrote as follows:

"3 methods of photographing sound waves on film for talking motion pictures and phonograph

"(a) use the 'speaking flame' (highly actinic gas)

"(b) very short fine filament incandescent lamp—superimposed voice current on the d.c. lighting current—*gas filled lamp*

"(c) 'glow tube' light—glass bulb filled with gas e.g. hydrogen, helium, nitrogen, or argon, or Hg. Electrodes of plat. Excite by high frequency currents, modulated by voice, exactly as in radio telephony 10-50- watt set probably ample."

According to the testimony, this document was initialed by DeForest and by Darby upon this very occasion, the latter having written upon the paper the letters "E&U." Darby testified that the initials "E&U" meant "Explained and understood," and that the conceptions involved were then and there explained to him by DeForest. Darby testified: "I gave the paper back to DeForest and had entirely forgotten about the matter until he mailed it to me in 1925 in response to my request to furnish what written data he could find bearing on the subject matter of this interference." DeForest testified that the paper in question had remained in the book of poems until prior to the trial of the interference when he had found it and mailed it to Darby.

It is apparent, we believe, that if this paper be what it is represented by the appellants to be, that DeForest conceived the invention here involved upon October 12, 1918. The learned district judge, however, refused to give it credence, stating in part:

"(2) It is incredible that all the entries were on this paper in their present form before the filing of the De Forest 1919 application. It is impossible that De Forest in 1918 knew about a 'glow light tube,' a 'gas filled lamp,' the use of 'helium' and 'argon,' 'platinum electrodes,' and 'a fine slit,' all features of a glow lamp and shown in the sketch, yet in 1919 files an application, which he claims was for a glow lamp and omits all these features. (3) Assume the sketch is unaltered since 1918, it is no part of the De Forest patent in issue and cannot be read into the specification of that patent. If the application does not disclose the invention, as I hold in this opinion, then the patent cannot be aided or bolstered up in the slightest degree by the sketch."

We will deal with each of these findings in turn. The record shows that immediately upon the return of DeForest to the United States, upon January 1, 1919, he proceeded to take steps tending to reduce his

conception to actual practice. The witness Coyer, in charge of the glass department of the DeForest Radio & Telegraph Company at that time, testified that on or about January 7, 1919, under the instructions of DeForest, he proceeded "to determine the luminosity of the ordinary atmosphere at various pressures from normal atmospheric to a fairly high degree of vacuum"; that this end was accomplished by passing electric currents across the terminals of tubes. Coyer further testified that, still pursuing DeForest's instructions, he next proceeded to the "study of the luminosity of various gases in Geisler tubes." Tubes filled with or containing amounts of vaporized alcohol, nitrogen, and hydrogen were tested for luminosity. This witness testified that DeForest stated to him that the purpose of these experiments in luminosity was to aid his attempts to record sound photographically. It is apparent that at this period, which was within a very short time after October 12, 1918, DeForest was already at work upon the testing of lamps filled with gas for luminosity and that these lamps were very closely related in their nature to glow lamps. The witness Garity testified that he was an assistant to DeForest, commencing his duties in the month of December, 1919; that to his knowledge DeForest experimented with various types of electrodes, including molybdenum, copper, and platinum; that in this period, from December, 1919, until the end of 1920, DeForest made use of two slits as an aperture whereby the light from the light source was to reach the film. The uncontradicted testimony of these witnesses serves to show quite apart from any testimony on the part of DeForest himself, that he was actually experimenting with lights in the nature of glow lights, with platinum electrodes and with slit apertures within a comparatively short time after the date of his alleged conception of the invention, the date of the "Carmania" memorandum of October 12, 1918. Such evidence seems to us plainly to support the conclusion reached by the tribunals of the Patent Office giving credence to the "Carmania" memorandum.

In respect to the second finding of the District Court, namely, that the sketch cannot be read into the specifications of the DeForest patent, we also disagree. If any part of the memorandum be considered, both the sketch and the words accompanying it must be taken into consideration. The question then presented is whether or not the words upon the memorandum in conjunction with the sketch do actually show a conception of the invention at issue. The answer to this question is in the affirmative if one skilled in the art, from the information contained in the memorandum, would be aware of the nature of the invention. The words of the memorandum refer to a glow light. The sketch shows a method of placing it into an electric circuit with other apparatus diagrammatically illustrated as one of "3 methods of photographing sound waves on film for talking motion pictures" as is stated in the memorandum. In our opinion the "Carmania" memorandum evidences the conception of the invention here in issue. If it be true, that one skilled in the art would operate the source of light disclosed in the DeForest patent as a glow light, then it follows inevitably that the memorandum evidences a conception of the invention later disclosed in the patent.

Having conceived the invention, is it a fact that DeForest proceeded with due diligence to reduce that conception to practice? We believe that there is ample evidence to support the conclusions of the tribunals of the Patent Office that he did in fact exercise such diligence. There is evidence to indicate DeForest returned to the United States upon January 1, 1919, and this date the Board of Appeals held should be taken to be the date of his conception of the invention, since upon October 12, 1918, he was on the high seas upon a ship of British registry. Since it is the recognized practice in the United States Patent Office in cases of interference to allow a foreign inventor to claim as the date of his conception of an invention, the date upon which a letter sufficiently describing that invention is received in the United States, DeForest as a citizen of the United States certainly must be put in no worse position than a foreign inventor, and we therefore hold that he is entitled to claim January 1, 1919, the first day of his re-entry into this country, as the date of his conception of the invention in question. There is evidence that DeForest proceeded with great energy to attempt to develop his invention along the three lines set out upon the "Carmania" memorandum, at least throughout the first part of the year 1919. Kenneth, a glass blower, testified that within a comparatively few weeks in the first half of 1919 he made four or five hundred tubes of various sorts, many of which were used

by DeForest and his assistants in their attempts to develop a suitable light source. While DeForest was in California, in February, March, and April of 1919, experiments to this end were carried on by his assistants in his absence. Logwood, a radio engineer in the employ of the DeForest Company during this period, testified that at the written request of DeForest tubes were made by Kenneth and were tried out by himself across the helix of a radio telephone transmitter; that one of such tubes when stimulated by a high frequency alternating current gave the effect, in the words of this witness, of a "successful glow lamp," glowing a silvery blue and that as voice currents affected the power that supplied the aerial, such voice changes also changed the intensity of the glow, "showing the variation of glow due to the voice vibration." DeForest for his part testified that one of his first acts upon returning to New York from California, in May, 1919, was to run through the tests which Logwood had made during his absence, "using the vacuum tube connected across the output circuit of the radio telephone transmitter, myself speaking into the microphone and watching the fluctuations of light in accordance with the sound waves." He also testified that shortly after this he experimented with tubes filled with nitrogen and also with a small incandescent lamp possessing a very short and fine tungsten filament. He stated that in the summer of 1919, he made use of an Edison phonograph mechanism and a photographic dry plate to record sound vibrations, employing a short filament incandescent lamp for this work. He testified that he proceeded to work upon the development of all three of the light sources described by him in the "Carmania" memorandum. He testified also that he first used the separated electrode type of light for the actual recording of sound photographically in the fall of 1919. In conclusion, we state that the record of this cause indicates that upon September 2, 1919, DeForest and his attorneys were already at work beginning to draft specifications for appropriate application to the United States Patent Office for a patent for his invention.

We have already referred in some particulars to the evidence adduced in the District Court referred to by the appellees as new evidence, including certain admissions by DeForest in the District Court specifically referred to upon the appellees' brief.

Many of the differences between the "new" and the "old" testimony disappear upon consideration of the record as a whole. The nature and effect of the new testimony, including the admissions of DeForest, we think, have been misunderstood by the appellees. We think it would be fruitless to pursue this subject further, beyond saying that the reason for the different results reached by the decisions of the tribunals of the Patent Office and the District Court rests primarily in difference of approach to the theories of invention of the respective inventors as heretofore indicated in this opinion.

### The Rule of Morgan v. Daniels as Applied to the Case at Bar.

We think that it is obvious from the foregoing that if the rule enunciated by the Supreme Court in Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 is applicable to the case at bar, that our opinion requires that the decree of the district court be reversed. Is that rule abrogated by the 1927 amendment to statute, section 4915, R.S., 44 Stat. 1336, § 11. The appellants contend that the rule is in full force and effect; the appellees urge the contrary.

The statute as amended, 35 U.S.C.A. § 63, is as follows:

"Whenever a patent on application is refused [, either] by the Commissioner of Patents [or by the Supreme Court of the District of Columbia upon appeal from the Commissioner], the applicant, *unless appeal has been taken from the decision of the board of appeals to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided, in which case no action may be brought under this section, may have remedy by bill in equity, if filed within six months after such refusal;* and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication and otherwise complying with the requirements of law. In all cases where there is no opposing party a copy of the bill shall be

served on the commissioner; and all the expenses of the proceedings shall be paid by the applicant, whether the final decision is in his favor or not. *In all suits brought hereunder where there are adverse parties the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony. The testimony and exhibits, or parts thereof, of the record in the Patent Office when admitted shall have the same force and effect as if originally taken and produced in the suit.*"

(Deletions caused by the amendment have been put in brackets. Additions created by the amendment are in italics.)

In our opinion the amendment has two practical results:

First, it provides that the losing party in an interference is not entitled to his remedy by suit if an appeal to the United States Court of Customs and Patent Appeals is pending or has been decided.

Second, it provides an efficient and speedy means of introducing the evidence taken in the interference proceedings into the trial of the cause in the District Court. A suit under section 4915 is "an original independent action in which the questions in issue are tried de novo upon all competent evidence new and old." Harper v. Zimmermann, D.C., 41 F.2d 261, 264; Victor Talking Machine Co. v. Brunswicke-Balke-Collender Co., D.C., 290 F. 565, 569, 570; Hernandez v. Prizma, D.C., 39 F.2d 196. In such a suit, prior to the amendment here in issue, the evidence given in the interference proceedings could be introduced only as secondary evidence, after

proper foundation laid. The competency of such evidence had to be determined according to the principles of equity jurisprudence. Dover v. Greenwood, C.C., 154 F. 854, 855, 856; Id., C.C., 177 F. 946; Id., 1 Cir., 194 F. 91; Sutton v. Wentworth, 1 Cir., 247 F. 493, 500. In other words, the witnesses who had testified in the interference proceedings had to testify anew in the suit in the district court. If they did not so testify their absence had to be accounted for in the usual way if the testimony taken in the interference was to be received as secondary evidence. The amendment was passed to avoid this arduous and expensive means of reproducing the evidence of the interference proceedings in the suit. It in no wise has the effect of abrogating the rule of Morgan v. Daniels. Cases decided after the enactment of the amendment specifically follow the rule, though the decisions do not refer specifically to the amendment. Powell v. McNamara, 2 Cir., 74 F.2d 750; Bayer v. Rice, 64 App.D.C. 107, 75 F.2d 238.

The evidence presented before the tribunals of the Patent Office and that received in the hearing in the District Court contain no substantial differences. All evidence both "new" and "old" has been carefully considered and much of it has been analyzed in this opinion. There is nothing in the evidence presented to the District Court of sufficient importance to overcome the findings of the tribunals of the Patent Office, and the rule enunciated by the Supreme Court in Morgan v. Daniels must be held to apply to the facts of the case at bar to prohibit the granting of the relief sought by the appellees in their bill of complaint.

The decree of the court below is hereby reversed, and the cause is remanded, with instructions to dismiss the bill.